```
                  IN THE UNITED STATES DISTRICT COURT
                 FOR THE MIDDLE DISTRICT OF FLORIDA
                            TAMPA DIVISION

  * * * * * * * * * * * * * * * *
                                 *
  UNITED STATES OF AMERICA       *
                                 *    Case No. 8:21-mj-1955
  vs.                            *
                                 *    September 23, 2021
  DE ANNA MARIE STINSON          *
  * * * * * * * * * * * * * * * *
```

                REPORTER'S OFFICIAL TRANSCRIPT OF THE
                    DETENTION HEARING HELD BEFORE
                 THE HONORABLE CHRISTOPHER P. TUITE
                  UNITED STATES MAGISTRATE JUDGE
                       SEPTEMBER 23, 2021

                          APPEARANCES:

FOR THE GOVERNMENT:

    Lisa Marie Thelwell
    US Attorney's Office – FLM
    400 N. Tampa Street
    Suite 3200
    Tampa, FL  33602
    813.274.6000


FOR THE DEFENDANT:

    Percy King
    Federal Public Defender's Office
    400 N. Tampa Street
    Suite 2700
    Tampa, FL  33602
    813.228.2715



                    Transcribed by Tana J. Hess
                    U.S. District Court Reporter
                    Middle District of Florida
                       801 N. Florida Avenue
                        Tampa, FL  33602
                          813.301.5207
                    tana_hess@flmd.uscourts.gov

1   This proceeding was done remotely via Zoom videoconference and
    may result in some inaccuracies and/or dropped words created by
2   audio conflicts that may arise during any web-based event.

3            THE COURT:  Good afternoon, everyone.  Madam clerk,

4   if you could call the two remaining cases for Stinson and

5   Gillimas, please?

6            COURTROOM DEPUTY:  United States of America versus

7   DeAnna Marie Stinson, criminal case number 8:21-mj-1955, and

8   United States of America versus Offiong Arnez Gillimas,

9   criminal case number 8:21-mj-299.

10           THE COURT:  If I could please have the appearances of

11   counsel for both cases, beginning with the Stinson case.

12           MS. THELWELL:  Good afternoon, Your Honor.  Lisa

13   Thelwell on behalf of the United States.

14           THE COURT:  Good afternoon.

15           MR. KING:  And good afternoon, Your Honor.  Percy

16   King on behalf of Mrs. Stinson.

17           THE COURT:  And for the Gillimas case?

18           MR. CANNIZZARO:  Good afternoon, Judge.  John

19   Cannizzaro on behalf of the United States.

20           MR. KING:  And good afternoon, Your Honor.  Percy

21   King on behalf of Mr. Gillimas.

22           THE COURT:  We are proceeding this afternoon on both

23   matters by way of video conference, and I want to make sure at

24   the outset that all participants in the video conference can

25   clearly see and hear me as well as the other participants.

1  Ms. Stinson, I'll begin with you.  Can you clearly see and hear
2  us all?
3          DEFENDANT STINSON:  Yes, Your Honor.
4          THE COURT:  And Mr. Gillimas, can you clearly see and
5  hear us all?
6          DEFENDANT GILLIMAS:  Yes, sir.
7          THE COURT:  I'll instruct all participants that if
8  any of you, particularly you, Mr. Gillimas, and you,
9  Ms. Stinson, have any trouble at all seeing or hearing me or
10 anybody else on video conference, you let me know immediately.
11 Do you understand, Ms. Stinson?
12         DEFENDANT STINSON:  Yes, sir.
13         THE COURT:  Thank you.  And Mr. Gillimas?
14         DEFENDANT GILLIMAS:  Yes, sir.
15         THE COURT:  If I do not hear or see you indicate in
16 some way, Mr. Gillimas, or you, Ms. Stinson, that you're having
17 trouble seeing or hearing me or anyone else on the video
18 conference, I will take it from that that you can clearly see
19 and hear us all.  Do you understand, Mr. Gillimas?
20         DEFENDANT GILLIMAS:  Yes, sir.
21         THE COURT:  And Ms. Stinson?
22         DEFENDANT STINSON:  Yes, Your Honor.
23         THE COURT:  I'll remind all participants that the
24 local rules prohibit the recording or broadcasting of court
25 hearings such as this one.  We are conducting this hearing by

```
 1   video conference this afternoon due to the COVID-19 pandemic.
 2   The Court's recent administrative order extending the
 3   implementation of the CARES Act authorizes the Court to conduct
 4   this proceeding by video conference with the Defendant's
 5   consent after the Defendant has conferred with counsel.
 6              Mr. King, have you spoken to both Ms. Stinson
 7   and Mr. Gillimas about the matter of whether they wish to
 8   proceed with their hearing by video conference?
 9              MR. KING:  Yes, Your Honor, and they both consent.
10              THE COURT:  Ms. Stinson, I'll begin with you.  Have
11   you discussed the matter of proceeding with this hearing by way
12   of video conference rather than in person with your lawyer,
13   Mr. King?
14              DEFENDANT STINSON:  Yes, Your Honor.
15              THE COURT:  Having conferred with counsel about the
16   matter, do you now consent to proceed with this hearing by
17   video conference?
18              DEFENDANT STINSON:  Yes, Your Honor.
19              THE COURT:  Thank you.  Mr. Gillimas, have you had an
20   opportunity to discuss the matter of proceeding with this
21   hearing by video conference with Mr. King?
22              DEFENDANT GILLIMAS:  Yes, sir.
23              THE COURT:  Having conferred with Mr. King about the
24   matter, do you now consent to proceeding with this hearing by
25   video conference?
```

```
 1              DEFENDANT GILLIMAS:  Yes, sir.
 2              THE COURT:  Both Mrs. Stinson and Mr. Gillimas, has
 3     anyone threatened or coerced you in any way to get you to
 4     consent to proceeding by way of video conference for this
 5     hearing?  Mr. Gillimas?
 6              DEFENDANT GILLIMAS:  No, sir.
 7              THE COURT:  And Ms. Stinson?
 8              DEFENDANT STINSON:  No, Your Honor.
 9              THE COURT:  Has anyone made any promises to you to
10     get to you consent to proceeding with this hearing by video
11     conference?  Ms. Stinson?
12              DEFENDANT STINSON:  No, Your Honor.
13              THE COURT:  I didn't quite hear you there.
14              DEFENDANT STINSON:  No, Your Honor.
15              THE COURT:  Okay.  And Mr. Gillimas?
16              DEFENDANT GILLIMAS:  No, sir.
17              THE COURT:  Based on the defendants' representations,
18     that of Mr. Gillimas and that of Ms. Stinson, my observations
19     of their demeanors, representations of counsel, I find that
20     their consent to proceed with this hearing by video conference
21     is made knowingly and voluntarily, and I will therefore
22     proceed.
23              With respect to each of you, there is an order
24     that has been enacted by Congress called the Due Process
25     Protection Act that requires me to give the following oral
```

1  admonition to the Government.  That is to you, Ms. Thelwell,

2  and you, Mr. Cannizzaro.  In particular, the Due Process

3  Protection Act directs that I give you the following

4  admonition.  As required by Rule 5(f), the United States is

5  ordered to produce all exculpatory evidence to the Defendant

6  pursuant to Brady v. Maryland and its progeny.  Failing to do

7  so in a timely manner may result in sanction, including the

8  exclusion of evidence, adverse jury instructions, dismissal of

9  charges, and contempt proceedings.

10            Now, Mr. Cannizzaro and Ms. Thelwell, I know

11  that you're fully aware of your obligations under Brady and its

12  progeny, but if you would kindly confirm for the record that

13  you understand your obligations and that you will adhere to

14  them.  Ms. Thelwell?

15            **MS. THELWELL:**  Yes, Your Honor.

16            **THE COURT:**  Mr. Cannizzaro?

17            **MR. CANNIZZARO:**  Yes, Judge.

18            **THE COURT:**  Ms. Stinson and Mr. Gillimas, each of you

19  are the subject of a charging instrument.  In your case,

20  Ms. Stinson, a complaint, and Mr. Gillimas, in your

21  circumstance, a supervised release violation petition.

22            With respect to you, Ms. Stinson, a criminal

23  complaint has been issued in this case, in particular

24  21-mj-1955, alleging in sum and substance that between on or

25  about July 30th of this year and September 14th of this year,

1    here in the Middle District of Florida, that you engaged in the

2    following violation:  Solicitation to commit a crime of

3    violence and second degree murder for hire, in violation of the

4    code sections that are denoted in the criminal complaint.

5                    Mr. King, have you received a copy of the

6    complaint?

7                MR. KING:  Yes, I have, Your Honor.

8                THE COURT:  Do you waive your client having a

9    physical copy of the complaint at this juncture?

10               MR. KING:  At this juncture, yes.

11               THE COURT:  And have you reviewed those charges with

12   your client to be, Ms. Stinson?

13               MR. KING:  Yes, Your Honor, I have.

14               THE COURT:  Do you waive a full and formal reading of

15   the complaint?

16               MR. KING:  Yes, I do, Your Honor.

17               THE COURT:  Mr. Gillimas, for your case, as I

18   indicated, there is a petition that has been issued in case

19   number 21-cr-299.  That petition alleges that you have

20   committed a number of violations of your supervised release.

21   In particular, it alleges in sum and substance you engaged in

22   new criminal conduct on or about September 9th of this year --

23   of this year in that you committed robbery with a firearm, a

24   deadly weapon involving less than $300 while on supervision, in

25   violation of the conditions of your supervised release.

```
1                    Violation 2 alleges that you engaged in new
2       criminal conduct, namely being a felon in possession of a
3       firearm in the second degree, occurring on or about, again,
4       September 9th of this year.
5                    Violation 3 alleges that you engaged in new
6       criminal conduct, namely aggravated assault with a deadly
7       weapon, occurring on or about September 9th of this year.  All
8       of those violations, again, are alleged to be in violation of
9       your conditions of supervision.
10                   Mr. Percy, do you wave a full and formal reading
11      of the petition on behalf of your client?
12              MR. KING:  Yes, I do, Your Honor.
13              THE COURT:  With respect to each of you, you each
14      have the right to be represented by counsel.  Your right to
15      counsel extends to all phases of this case, whether they occur
16      in a video hearing like this or in the courtroom or outside of
17      the courtroom.
18                   You have the right to have an attorney with you
19      during any questioning by law enforcement.
20                   In addition, you have the right to retain --
21      that is, hire -- your own lawyer using your own money, or if
22      you qualify, you have the right to have an attorney appointed
23      to represent you at no cost.
24                   Do each of you understand your right to counsel?
25      Ms. Stinson?
```

1      **DEFENDANT STINSON:**  Yes, Your Honor.

2      **THE COURT:**  And Mr. Gillimas?

3      **DEFENDANT GILLIMAS:**  Yes, sir.

4      **THE COURT:**  And to you both -- Ms. Stinson, I'll

5   begin with you.  Do you wish to retain your own lawyer, or do

6   you wish to have a lawyer appointed to represent you at no

7   cost?

8      **DEFENDANT STINSON:**  Court appointed.

9      **THE COURT:**  Mr. King, I don't know if you reviewed

10   Ms. Stinson's pretrial services report, but it does not appear

11   on the face of that report that she qualifies for the

12   appointment of counsel.

13      **MR. KING:**  Your Honor, I reviewed it, and the reason

14   why I believe that she actually does qualify is because having,

15   you know, recently come from private practice, a case like

16   this, it would require a minimum of 250-plus thousand dollars

17   up front for a decent lawyer to actually take the case, all the

18   way up to at least a half a million up front.  She does not

19   have that, although she does have $100,000 in a 401(k) which is

20   required that she pay about 40% tax on that, and she does have

21   $25,000 up front.  For federal cases it's very different.  It's

22   (unintelligible), and because of that, I do believe that she

23   would qualify.

24          And also in speaking with other attorneys within

25   the last year on some of the cases that we initially had and

1  they were hired out, 250-plus thousand dollars has been it at

2  least for the last two.  Because of that, I don't believe that

3  she can actually pay that up front.

4          THE COURT:  Ms. Thelwell, what's the position of the

5  Government on the issue?

6          MS. THELWELL:  Your Honor, I'm not sure what the

7  financial (unintelligible) is as to whether or not she

8  qualifies for the services of the Federal Defender's Office.

9  In reviewing her pretrial report, it does not appear that she

10  qualifies.  She appears to have enough income in relation to

11  any debt that she will be able to procure an attorney on her

12  own.  I'm not familiar with private counsel rates up to half a

13  million dollars for this type of case.  I think that

14  Ms. Stinson is able to find a competent and good attorney for

15  significantly less than that.  I would request that Ms. Stinson

16  at least make a good faith effort in an attempt to locate an

17  attorney -- or secure an attorney given the resources that she

18  has.

19          THE COURT:  What I'm going to do, Counsel -- that is,

20  Mr. King and Ms. Thelwell -- is provisionally appoint the

21  Federal Public Defender's Office to represent in you this

22  matter, Ms. Stinson.

23          DEFENDANT STINSON:  Thank you, Your Honor.

24          THE COURT:  Mr. King, do you accept the appointment

25  provisionally?

| | |
|---|---|
| 1 | **MR. KING:**  Yes, I do, Your Honor.  Thank you. |
| 2 | **THE COURT:**  At an appropriate juncture later on in |
| 3 | this proceeding, I want to bring the parties back |
| 4 | (unintelligible) the schedule so the parties can look into the |
| 5 | matter more (unintelligible) and to address the options that |
| 6 | may be available, whether it is a situation where you think she |
| 7 | is purely able to procure counsel or not or in between |
| 8 | somewhere where she can contribute some amount of payment to |
| 9 | conform for representation by the Federal Public Defender's |
| 10 | Office. |
| 11 | Mr. Gillimas, let me turn to you.  Do you wish |
| 12 | to retain your own lawyer, or do you wish to have a lawyer |
| 13 | appointed to represent you at no cost? |
| 14 | **DEFENDANT GILLIMAS:**  A lawyer appointed. |
| 15 | **THE COURT:**  Mr. Gillimas, do you have any money in |
| 16 | the bank or anywhere else? |
| 17 | **DEFENDANT GILLIMAS:**  No, none. |
| 18 | **THE COURT:**  Do you own any property or other assets? |
| 19 | **DEFENDANT GILLIMAS:**  No, none. |
| 20 | **THE COURT:**  Did you say no, you don't? |
| 21 | **DEFENDANT GILLIMAS:**  No, sir. |
| 22 | **THE COURT:**  When is the last time you were employed? |
| 23 | **DEFENDANT GILLIMAS:**  Five, six months ago. |
| 24 | **THE COURT:**  And what did you do when you were |
| 25 | employed? |

1    **DEFENDANT GILLIMAS:**  Traffic -- traffic
2    supply (unintelligible) STS, like set it up and stuff
3    (intelligible) all the wires and lights and things that --
4    **THE COURT:**  How much did you make when you were doing
5    that?
6    **DEFENDANT GILLIMAS:**  One hundred and something maybe
7    a week, because it was kind of (unintelligible).  When the
8    storm happened down in Texas, everybody really (unintelligible)
9    so we just had a lot of (unintelligible).
10   **THE COURT:**  Mr. King, have you discussed with
11   Mr. Gillimas his financial circumstance?
12   **MR. KING:**  Yes, and I believe that he definitely
13   qualifies.
14   **THE COURT:**  Just to be clear, any reason to think
15   that he was not qualified?
16   **MR. KING:**  No, Your Honor.
17   **THE COURT:**  Based upon the defendant's
18   representations and that of Mr. King, I find that Mr. Gillimas
19   qualifies for the appointment of counsel.  I formally appoint
20   the Federal Public Defender's Office to represent you,
21   Mr. Gillimas.
22   Mr. King, do you accept the appointment?
23   **MR. KING:**  I do, Your Honor.  Thank you.
24   **THE COURT:**  In addition to the rights of which I've
25   advised you, Mr. Gillimas and Ms. Stinson, you each have the

1    right to remain silent; that is, you have the right not to make
2    a statement (unintelligible).  If you have already made a
3    statement, you need not say anything further.  If in the future
4    you begin to make a statement, you may stop at any time.
5    Please keep in mind that any statement that you do make outside
6    of private consultation with your lawyer may be used against
7    you.
8                    Do you each understand your right to remain
9    silent?  Ms. Stinson?
10           **DEFENDANT STINSON:**  Yes, Your Honor.
11           **THE COURT:**  And Mr. Gillimas?
12           **DEFENDANT GILLIMAS:**  Yes, sir.
13           **THE COURT:**  And to both of you, having reviewed the
14   charges, Ms. Stinson, do you understand the charges that you
15   face?
16           **DEFENDANT STINSON:**  Yes, Your Honor.
17           **THE COURT:**  And Mr. Stinson (verbatim), do you
18   understand the nature of the allegations here?  Mr. Gillimas,
19   do you understand the nature of the violations that have been
20   alleged against you?
21           **DEFENDANT GILLIMAS:**  Yes, sir.
22           **THE COURT:**  Ms. Stinson, in your case, you're
23   entitled to a preliminary hearing.  The purpose of a
24   preliminary hearing is to determine whether there's probable
25   cause to believe that you have committed one or more of the

1    violations alleged in the complaint.  At that hearing, the
2    Government would bear the burden to show probable cause that
3    you had engaged in one or both of these criminal offenses.  At
4    such a hearing, you would be entitled to appear there along
5    with your attorney, and your attorney would be entitled to
6    cross-examine any witnesses at the hearing in your defense and
7    also to produce evidence in your defense.
8              Mr. King, what is your client's preference for
9    the preliminary hearing?
10             **MR. KING:**  She does want the preliminary hearing,
11   Your Honor.
12             **THE COURT:**  Looking at the schedule, a preliminary
13   hearing on October 1st or October 2nd.  October 1st is a
14   Monday, and October 2nd is a Tuesday.  I'm inclined to schedule
15   it on October 2nd at 1:00 p.m.  Ms. Thelwell, will you have
16   your witnesses ready by then?  Ms. Thelwell, your microphone is
17   on mute.
18             **MS. THELWELL:**  Thank you.  I was double-checking my
19   calendar.  You said October 2nd?
20             **THE COURT:**  Correct.
21             **MS. THELWELL:**  That is a Saturday.
22             **THE COURT:**  October 5th.  My apologies.
23             **MS. THELWELL:**  Okay.
24             **THE COURT:**  October 5th at 1:00 p.m.
25             **MS. THELWELL:**  The agent is on the Zoom hearing.

1  Agent Sanchez, are you available on October 5th at -- did you
2  say 1:00 p.m., Your Honor?
3          THE COURT:  1:00 p.m., correct.
4          THE AGENT:  Yes, I am.
5          THE COURT:  Ms. Thelwell, you understand your
6  obligation with respect to both Jencks and discovery elsewhere
7  and otherwise, including Rule 26.2?
8          MS. THELWELL:  Yes, Your Honor.
9          THE COURT:  I just wanted to make sure you were aware
10 of your obligations there.
11          Mr. King, how does October 5th at 1:00 p.m. look
12 for you?
13          MR. KING:  That should work, Your Honor.
14          THE COURT:  We'll schedule the preliminary hearing
15 then for October 5th at 1:00 p.m.
16          Mr. Gillimas, similarly you're entitled to a
17 preliminary hearing if you're held in custody.  The purpose of
18 a preliminary hearing, similar to what it is with respect to
19 Ms. Stinson's case, is to determine whether there's probable
20 cause to believe that you have committed one or more of the
21 alleged violations in the petition.  At that preliminary
22 hearing, you'd be given an opportunity to appear and present
23 evidence, and upon request you can question any adverse
24 witnesses unless the Court were to determine that in the
25 interests of justice, the witnesses were not required to

1  appear.

2         You also have the right to waive a preliminary

3  hearing.

4         Mr. King, what is Mr. Gillimas' position with

5  respect to the preliminary hearing?

6         **MR. KING:** Your Honor, because he believes that the

7  witnesses are going to recant, the alleged victim is going to

8  recant, I guess we would like to have a hearing then.

9         **THE COURT:** Mr. Cannizzaro --

10        **MR. CANNIZZARO:** The hearing --

11        **THE COURT:** -- are you prepared to move forward, or

12  are we going to have to schedule this at another time?

13        **MR. CANNIZZARO:** Your Honor, I have been attempting

14  to contact the lead detective, and I think it might be best to

15  set a date for this so that I could call her to the stand as a

16  witness.

17        **THE COURT:** What date do you propose?

18        **MR. CANNIZZARO:** Whatever -- whatever is sufficient

19  with the Court. As long as I can get my detective on the Zoom,

20  I mean, I could do it tomorrow.

21        **THE COURT:** Mr. King?

22        **MR. KING:** I would propose having it possibly done on

23  the 5th after the one that we already have. However, let me

24  look and see what I have for tomorrow. Tomorrow anytime after

25  10:00 actually works for me as well, Your Honor.

1    **THE COURT:**  Mr. Cannizzaro, I'm inclined since the
2    Court hears duty matters beginning at two -- how long do you
3    think that your hearing would last?
4    **MR. CANNIZZARO:**  Your Honor, I'm very unfamiliar with
5    the Zoom and introduction of evidence.  There is body cam
6    footage of the Defendant confessing to the robbery, so I have
7    to figure out how to play that.  I anticipate I could do that
8    today and learn all about it and be ready for you tomorrow in
9    and I'd say under a 30-minute hearing.
10    **THE COURT:**  Mr. King, how long do you anticipate
11    cross-examination would be?
12    **MR. KING:**  Depending on what the evidence is, at the
13    most 30 minutes, Your Honor.
14    **THE COURT:**  As far as reports, Mr. Cannizzaro, does
15    Mr. King have all the records that you propose to show so that
16    he can conduct a fulsome cross-examination?
17    **MR. CANNIZZARO:**  I have I believe all the reports
18    minus one supplement right now that I can send over to
19    Mr. King.  As far as getting a copy of his confession on body
20    cam, there's probably a way that I can do that, but in an
21    abundance of caution, if that may take me a day, do you want to
22    postpone it until the 5th?  That's fine with me, too.  I just
23    want to make sure Mr. King has everything that I have.  I don't
24    have it yet.  I know that I'm trying to get it right now as we
25    speak.

1      **THE COURT:**  Mr. King and Mr. Cannizzaro, my concern

2  here is that while counsel is doing their best to be prepared

3  for a hearing as soon as possible, the logistics of doing that

4  with video like Mr. Cannizzaro has indicated and to ensure,

5  Mr. King, that you have reports and discovery, suggest that

6  even if we were to schedule this for tomorrow, there's a good

7  chance that the parties would not be prepared to move forward.

8  I want to avoid that.

9      I would suggest that we schedule this a week out

10  on October 1st at 2:00.  Mr. Cannizzaro, the intent there is

11  that you get enough time to (unintelligible) the witnesses and

12  to arrange for discovery to be turned over to Mr. King and to

13  work out with my courtroom deputy mechanics on displaying the

14  video on video conference.

15      **MR. CANNIZZARO:**  Yes, Your Honor.  I -- I apologize.

16  I didn't mean to cut you off.  I will definitely do that.

17      Is there any other date that is amenable to the

18  Court besides October 1st, either earlier or later than that

19  date?

20      **THE COURT:**  We could also do it on the 4th or the

21  5th.

22      **MR. CANNIZZARO:**  I'm fine with the 4th or the 5th.

23  It's just that I'm not -- I am not going to be available on

24  that date, the 1st.

25      **THE COURT:**  You could also have somebody step in for

```
 1   you.
 2              Mr. King, I want to make sure that we have a
 3   date you're agreeable to and have no objection to it.  So the
 4   options are bringing in another AUSA on the 1st or scheduling
 5   it as you first indicated beginning of the following week.
 6   Again, the intent there is to make sure that with respect to
 7   the underlying (unintelligible), that you have all the
 8   discovery and a chance to view video would be part of that
 9   discovery and have an opportunity to review it with your client
10   in between here so that you can conduct your part of your
11   investigation (unintelligible) cross-examination that I'm sure
12   you wish to pursue.
13              MR. KING:  I think the 5th would be great, Your
14   Honor.
15              THE COURT:  Why don't we return then to the 5th?
16   Mr. King, did I hear you to say you're requesting the 5th; is
17   that correct?
18              MR. KING:  Yes, please.  Thank you.
19              THE COURT:  Madam clerk, if we schedule this for
20   2:00, will that abide by the schedule that you have that day?
21              COURTROOM DEPUTY:  Yes, Your Honor.
22              THE COURT:  We'll schedule it then for 2:00 on the
23   5th.  It will be immediately following Ms. Thelwell's and
24   Mr. King's preliminary hearing.  Mr. King, I'm hopeful that we
25   can do both of your matters back to back, presumably inure to
```

1  the benefit of your scheduling.  Would that be fair to say?

2          **MR. KING:**  Yes.  Thank you, Your Honor.

3          **THE COURT:**  Mr. King's request to schedule this

4  matter and that of the Government on the 5th are granted for

5  the reasons stated by counsel.  The Court finds to the extent

6  that it must make a good cause finding, that it does so given

7  the nature of the violations here, which appear to be those

8  involving state offenses, including robbery, felon in

9  possession, and aggravated assault, which would presumably have

10 a fair number of reports and witnesses and physical evidence to

11 be provided among the parties or exchanged to allow the parties

12 to investigate the issues and also to present them to the Court

13 in fulsome fashion.

14          Mr. Cannizzaro, as I mentioned to Ms. Thelwell,

15 I trust that you will provide Mr. King with all of the

16 discovery that you do have, and Mr. King, any reciprocal

17 discovery that you have as well in a timely fashion so that we

18 don't have to continue it.  Fair enough, Mr. Cannizzaro?

19          **MR. CANNIZZARO:**  Yes, Judge.  Thank you very much.

20          **THE COURT:**  And Mr. King?

21          **MR. KING:**  Yes.  Thank you, Your Honor.

22          **THE COURT:**  I'll address with Mr. Gillimas the issue

23 of detention or release.  In addition to the rights of which

24 I've advised you, Mr. Gillimas, you also have the right to have

25 the matter of your release or detention be heard at this time.

1  Mr. Cannizzaro, what is the Government's position on that
2  issue?
3          **MR. CANNIZZARO:**  Your Honor, based on the fact that
4  he was arrested for new law violations involving the state of
5  Florida, aggravated assault, robbery with a firearm, and felon
6  in possession of a firearm, as well as the fact that he was on
7  supervised release for offenses involving threats, we feel that
8  he should be detained.  The burden is on him to establish
9  beyond clear and convincing evidence that he will not pose a
10 risk of danger to anybody or to the community or flee.
11         **THE COURT:**  Although I emphasize that the preliminary
12 hearing is conditioned on the Defendant being held in custody,
13 we have worked out a schedule that appears to be one that meets
14 the demands of both sides.
15             Mr. King, on the issue of detention or release?
16         **MR. KING:**  Your Honor, he was going to reserve it.
17 Looking at the charges, and understanding that he believes that
18 the alleged victim was going to recant, this would give the
19 Court enough information to actually make a determination in
20 his favor, so he wanted to reserve it at that time.
21         **THE COURT:**  Based on the Government's request, the
22 information before the Court, and the fact that Mr. Gillimas --
23 in a situation like this, the Defendant has the burden of
24 showing by clear and convincing evidence that he will neither
25 flee nor pose a danger to any other person in the community, I

1   am going to (unintelligible).  Based on the reserving the

2   matter, you'll have the right to revisit that issue at a later

3   time should the circumstances warrant such relief, but in light

4   of the fact that you have reserved on the issue, you have not

5   met your burden.  I direct that you be detained.

6              Anything else, Mr. Cannizzaro, to be heard on

7   the Gillimas matter?

8              **MR. CANNIZZARO:**  No, Your Honor.  Thank you very

9   much.

10             **THE COURT:**  Mr. King, anything further on the

11  Gillimas matter?

12             **MR. KING:**  Nothing further, Your Honor.

13             **THE COURT:**  We'll be in recess on the Gillimas

14  matter, and we'll turn back again to Ms. Stinson.

15             In addition to the rights, Ms. Stinson, of which

16  I've advised you, you also have the right to have the matter of

17  your detention or release be heard.  Ms. Thelwell, what is the

18  Government's position with respect to release or detention?

19             **MS. THELWELL:**  United States is seeking detention,

20  Your Honor.

21             **THE COURT:**  And before I ask you for a more fulsome

22  presentation, Mr. King, what is the defense's position?

23             **MR. KING:**  Your Honor, she's seeking release.

24             **THE COURT:**  Ms. Thelwell, I'll hear from you then on

25  the basis for your request for detention.

1        **MS. THELWELL:**  Yes, Your Honor.  United States moves

2    for detention under 18 United States 33142(f)(1) in that the

3    charges involve a crime of violence.

4              As the Court is aware in reviewing the

5    complaint --

6          **THE COURT:**  I'm sorry.  I heard a voice there.  The

7    only -- let me just have you pause for a moment.  The only

8    audio that should be on outside of Ms. Thelwell should be that

9    of the Defendant whose audio (unintelligible) of the deputy

10   must remain on.  See that all the other microphones have been

11   turned off.

12             Ms. Thelwell, if you could proceed again.

13         **MS. THELWELL:**  Yes, Your Honor.  As the Court is

14   aware in reviewing the signing on the criminal complaint, the

15   two allegations here are violations of 18 United States 37 --

16   373, a solicitation to commit a crime of violence, as well as

17   murder for hire in violation of 1958.

18             The allegations here are significant.  In

19   reviewing the facts of the case, Ms. Stinson attempted to

20   solicit an individual to kill the wife of her former

21   significant other who resides outside of the Middle District of

22   Florida.  Back in June of 2021, approximately June 24th, 2021,

23   she created an account on a dark web website that is solely on

24   the dark web for the purpose of providing quote-unquote hitman

25   services.  In fact, when law enforcement officers accessed the

1  website and were able to view it, they took a screenshot of
2  several (unintelligible) of the website.  The "About" section
3  specifically says, "We are the top dark net marketplace
4  providing hitmen.  We have experienced killers in most
5  countries.  To communicate with a killer about a job, please
6  order, and then you can chat here online with the assigned
7  killer."
8          And right below that is the opportunity for an
9  individual like Ms. Stinson to create an account with the
10  website.
11          After Ms. Stinson did that, the very next day on
12  or about June 25th of 2021, she placed what's called an order
13  on the website to have the victim in this case murdered.  She
14  specifically requested that the act not occur at home, and
15  further specified a date range in which she would like to have
16  that murder take place.
17          When she didn't -- and she also paid money into
18  the website in order to facilitate this killing of the
19  individual.  In total, she transacted or conducted transactions
20  on that website at least five separate times totaling over
21  approximately $12,000 when that dollar -- when the Bitcoin
22  currency that was being used converted to a U.S. dollar amount.
23          She provided the website administrators in her
24  request with a photo of the victim.  That photo law enforcement
25  officers learned when interviewing the victim was publicly

1   available on a wedding website that was used by the victim and

2   Ms. Stinson's former significant other.

3            In requesting that the murder take place on

4   specific dates in July, it became apparent that the reason

5   Ms. Stinson did that is because she planned to be out of the

6   country in Hawaii during the time that the murder was supposed

7   to take place, showing that she has thought this through and

8   decided to plan some sort of alibi to further immunize herself

9   from any potential culpability.

10           Law enforcement officers received a tip about

11  Ms. Stinson's activity on the dark web.  They reviewed

12  information that was contained on that website that showed the

13  account history of a user name account that we now know belongs

14  to Ms. Stinson.  In reviewing that information, they found --

15  they were able to basically (unintelligible) the payments that

16  were made to the website by Ms. Stinson using blockchain

17  analysis which led them to Ms. Stinson's personal Coinbase

18  account which was used to fund the transactions.

19           In reviewing the records that were provided by

20  Coinbase, it showed that that account was specifically

21  registered to Ms. Stinson and her name, date of birth, all of

22  her personal identifying information, and as a matter of fact,

23  because Coinbase is a financial services provider, they're

24  required to keep (unintelligible) customer requirements,

25  meaning they also had to verify her identity.  Ms. Stinson

1    provided her driver's license on multiple occasions to

2    Coinbase, which Coinbase retained those records, and we do have

3    photographs of her driver's license.  We even have selfie-filed

4    photographs that are taken in the verification process when

5    establishing an account, and they clearly depict Ms. Stinson as

6    the -- the verification of that account.

7               When further looking at those records, they also

8    found additional corroborative information that tied

9    Ms. Stinson's Coinbase record -- or Coinbase account, I should

10   say, to the various purchases that were made on the website as

11   well as corroborating her travel to Hawaii.  At some point when

12   she did, in fact, travel to Hawaii, at the (unintelligible) in

13   her pretrial bail report and as further corroborated by travel

14   records that the agent was able to obtain, Ms. Stinson accessed

15   her Coinbase account while in Hawaii.  We know that because we

16   have the IP address for that.  The IP logs also trace back to

17   her residence here in the Middle District of Florida showing

18   that she was also conducting transactions from her Coinbase

19   account while here locally in the Tampa Bay area.

20              Despite all of this compelling information or

21   evidence that the Government has obtained, this morning when

22   confronted by law enforcement in an attempt to execute a search

23   warrant and arrest warrant, Ms. Stinson, after waiving her

24   rights -- she was given Miranda, she agreed to talked to law

25   enforcement, and seem baffled, shocked, completely caught off

1    guard about the allegations that the agent presented her with.

2    The agent even -- I actually skipped a step, Your Honor.

3              If you recall in the complaint, after gathering

4    this information, law enforcement reached out to Ms. Stinson

5    prior to making the arrest and securing the complaint in an

6    undercover capacity.  They cold-called her on WhatsApp.  She

7    responded both via text message, which we do have those text

8    messages back and forth with the undercover, as well as a phone

9    call which was recorded by the undercover, and in that

10   conversation, the undercover would confirm that Ms. Stinson

11   did, in fact, have intention to carry out this murder for hire,

12   confirmed with a photo of the victim to make sure that that is

13   the same individual Ms. Stinson intended to have killed.

14   Ms. Stinson confirmed visually and confirmed that she would not

15   back out and that she would not have regrets.

16             After that is when the complaints were secured,

17   and this morning when confronted with the text messages, all of

18   the information that I just provided to the Court as well as

19   her own voice -- the agents played her the audio recording of

20   her talking to the undercover.  Ms. Stinson adamantly denied

21   having any involvement in this crime, even though the evidence

22   clearly shows the contrary.

23             She did admit, however, that the phone number

24   that the agents had acquired was her phone number, that was her

25   home, that was in fact her voice on the call.  She denied

1   knowing about the dark web.  She denied knowing anything about
2   cryptocurrency.  She denied owning any Bitcoin or using
3   Bitcoin.  Specifically she said that she used some sort of
4   other off-brand cryptocurrency, denied having anything to do
5   with Coinbase.  Those statements directly contradict the
6   evidence (unintelligible) during the search warrant.
7                   Now, when agents had completed the search
8   warrant, they found a ledger -- not a ledger, but a notebook, a
9   handwritten notebook inside her purse which was inside one of
10  the rooms -- I think it was the office, I can't quite recall --
11  in her house that lo and behold had the exact name of the user
12  name account that she used on the dark web.  It had information
13  about her Coinbase account that she denied having, and also it
14  had information about a Bitcoin escrow account that's
15  referenced throughout her conversations with the website
16  administrator, and it's also fleshed out more fully in the
17  complaint.
18                   In addition to that, law enforcement agents
19  seized multiple electronic devices, one of them being her cell
20  phone.  The forensics are still pending on that, but the agent
21  was able to manually review her cell phone for anything that
22  might be immediately apparent.  He observed -- and I do have
23  photos of it -- the Coinbase application that had been
24  installed on her phone, a virtual private network application
25  that's installed on her phone, transactions showing

1  transactions with Bitcoin and specifically with two of the

2  Bitcoin addresses that are controlled by the website which

3  shows that money is being sent to that location.

4          THE COURT:  When you say the website, you're

5  referring to the website claiming to provide murder for hire

6  services?

7          MS. THELWELL:  Yes, Your Honor.  I wanted to keep the

8  language consistent with what is in the complaint.  That

9  website on the dark web, we just called it "the website"

10 throughout, so in this hearing when I reference "the website",

11 that is exactly what I'm talking about, Your Honor.

12              So I say all that to say that, you know, the

13 evidence in this case is extremely strong.  The allegations are

14 serious.  You know, these are crimes -- because Ms. Stinson had

15 no idea that this website did not actually carry out murder for

16 hire services.  They essentially act as some sort of scam.

17 They put themselves out or hold themselves out to provide

18 murder for hire services, but they don't actually fulfill that.

19 And in reviewing the evidence, Ms. Stinson did not try once,

20 twice, or three times, but multiple times.  She repeatedly

21 reached out to the website administrators to facilitate the

22 murder of this other individual and paid over $12,000 in cash

23 to do so, offered (unintelligible) money, and in fact -- I

24 forgot to mention this before -- paid the undercover through

25 Bitcoin, directly through a Bitcoin address that is controlled

1   by the Government, an additional $350, after he told her, the

2   undercover told her that he needed it in order to purchase a

3   gun to carry out the act.

4               These are extremely disturbing allegations, and

5   it's the Government's position that -- I understand Ms. Stinson

6   appears to be an upstanding woman otherwise, right?  She's the

7   CFO of a church here.  She appears to be an upstanding

8   community member.  She doesn't really have any criminal

9   history.  This seems extremely out of character for

10  Ms. Stinson, but that does not undercut the severity of the

11  crimes alleged here, her danger to the community, and for the

12  victim.  She was able to carry out this crime completely

13  electronically, either at her home or while she was on vacation

14  in Hawaii, and it just continues to show her willingness to

15  carry out this act.  It's the Government's position that if

16  released, you know, there is a continued concern for the victim

17  as to whether or not she will continue efforts in trying to

18  accomplish her goal.

19              So it's the Government's position, we agree with

20  pretrial services' recommendation.  There is no combination of

21  conditions that's going to assure not only Ms. Stinson's

22  presence -- because she obviously has financial means and the

23  ability to flee if she'd like -- but also the safety of the

24  community.

25              And so for those reasons, Your Honor, we are

1  requesting that she be detained pending a resolution in this
2  case.
3          THE COURT:  A few follow-up questions, Ms. Thelwell,
4  beginning with what is the penalty to which you believe the
5  alleged defendant to be subject as a result of these charges?
6          MS. THELWELL:  Yes, Your Honor.  In looking at 18 USC
7  1958, it says that she shall be imprisoned for not more than 10
8  years.  So it's a maximum of 10 years and then under -- well,
9  the maximum is 10 years.  The -- under 18 USC 373, it's not
10  more than half of the -- it's not more than five years
11  (unintelligible).
12          THE COURT:  The victim here alleged is the spouse of
13  a former significant other of the Defendant?
14          MS. THELWELL:  Correct.
15          THE COURT:  Thank you, Ms. Thelwell.
16              Mr. King, any response?
17          MR. KING:  Thank you so very much, Your Honor.  I
18  looked at this initially, the first thing I was drawn to was
19  (unintelligible) of the criminal complaint, and it's something
20  that the Government actually pointed out, and (unintelligible)
21  website from the dark web that advertised murder for hire
22  services, and when the Government was explaining how hokey this
23  website was, it made sense when I read the next line, and it
24  says, "As law enforcement presently understands, although the
25  website offers murder for hire services, it never actually

1  delivered on the promised services after receiving payment from
2  its customers."  Never.  This is something that
3  (unintelligible).  It was a hokey website.  This is something
4  that people who actually don't want anything to happen can do,
5  and when you look further into this criminal complaint, it
6  explains that these people can get their money back.  So even
7  to the extent that she actually did put $12,000 not even
8  meaning that, but it was money that would come back.
9          THE COURT:  What is your proper reason for doing
10 that?
11         MR. KING:  Well, I'm not saying that she actually did
12 it.  What I'm saying is that this is actually like a hokey
13 site.  If somebody is upset with somebody, they can pretend to
14 do something and not actually happen, because they know it's
15 not going to happen.  The Government's self-serving explanation
16 that she didn't know, and once you go there, you read the
17 hokey -- anybody would have said that nobody has ever done
18 this, or all could be refused.  Nobody has actually been
19 killed.  Nobody has actually ever had anything happen to them.
20         THE COURT:  Mr. King, if I could, how do you
21 explained the undercover allegation?  Subsequently had money
22 paid to secure a weapon.
23         MR. KING:  Your Honor, to the extent that it actually
24 happened, going through this, it's still part of the
25 therapeutic of being upset with somebody, but knowing that it's

1   actually not going to happen, because nobody on this website

2   has ever done anything.  It's all a part of the service, of her

3   actually being able to feel better about something.  Nothing

4   has ever happened.  It doesn't make a difference how many steps

5   they go.  Nothing is ever going to happen.  So if nothing is

6   ever going to happen, all you're getting is (unintelligible)

7   relief.  This is a woman who has been the CFO of a church, and

8   full disclosure, a church that I actually attended back from

9   2006 to 2009 before she got there.  And once you --

10          THE COURT:  I want to make sure, Mr. King, that that

11  does not raise any sort of a conflict issue.

12          MR. KING:  It does not.  I'm sorry.  I wanted to say

13  it does not, because I only went there before she was there.

14  So I never met her.  She wasn't CFO when I was there, and I

15  haven't been a member of that church since about 2010.

16              Can I go on?

17          THE COURT:  Please.

18          MR. KING:  Okay.  All right.  So in order to get the

19  position at the church, she really has to be somebody who

20  actually follows Christianity.  Now, she does not have a

21  criminal record.  Yes, she has a passport.  She has traveled.

22  (Unintelligible) that passport.  This is not somebody who's

23  ever going to hurt someone, and that is definitely not somebody

24  who is going to harm the alleged victim.  There is no reason

25  to, you know, go after her in real life.  If she wanted to,

1   there are people here in Tampa.  If she has the means, that
2   would have happened.  That is not actually what's happening
3   here.

4           Sometimes people do stupid things to make them
5   feel better, but aren't actually criminal.  This is not the
6   type of woman who would actually do something that actually
7   (unintelligible) criminal.  So in order to make herself feel
8   good, to the extent that she did any of these things, it's all
9   a part of dealing with what's going on in her head mentally,
10  and she knew that nothing was going to happen.  She was going
11  to get that money back.

12          Because she is not going to flee.  She has never
13  been that type of person.  She's not been in trouble.  Right
14  now she's really going through it.  To the extent that she
15  acted (unintelligible) she didn't plan on actually doing
16  anything.  You know, just all kind of a really big
17  misunderstanding, because going to that website, nothing ever
18  occurred with anybody, and the Government (unintelligible)
19  again, it just -- it doesn't read like somebody that would deal
20  in the dark web that's actually for real.  I mean, this is
21  purely an entertainment, novelty type of thing.  This is not
22  her going to somebody that she had no idea and that they'd
23  actually done something before.  This is not a word of mouth
24  thing.  This is not her actually trying to have this happen,
25  Your Honor.

1          She has two jobs.  (Unintelligible).  She has
2    lived here since 2013.  She's lived here before, and she has
3    been a member of that church, and having the position that she
4    actually has, she is not going to leave.  She is not a danger
5    to society.  She has not (unintelligible) to do anything to
6    anyone.

7          And based upon 1958 and 18 USC 373, it's a
8    five-year maximum.  That is, if they actually believe that she
9    was trying to do something.  They have no reason to believe --
10   she has no reason to try to harm anyone.  She knows the
11   Government is watching.  There are conditions that we can place
12   on her that will allow her to go to work and allow her to be at
13   home, you know, whether it's home confinement -- she has a home
14   that she's in the process of purchasing.  She just bought it
15   last year, so she has no equity in it.

16          THE COURT:  If I could have you pause for a moment,
17   Mr. King.  The allegation is that your client is utilizing in
18   particular the dark web or other sophisticated means to arrange
19   allegedly for murder.  What conditions could the Court impose
20   against that backdrop?  If you accept the proffer that there's
21   evidence to support the allegation, including not just
22   (unintelligible) matters reference to the complaint, but also
23   the items that apparently were viewed or seen today.  Against
24   that backdrop, what conditions could the Court impose that
25   would address (unintelligible) but also danger, particularly as

1  it relates to your client's prior alleged use of electronic

2  equipment and other sophisticated means to arrange for this

3  event?

4         **MR. KING:**  Your Honor, one thing would be necessarily

5  the home confinement; the restriction of the use of computers

6  with the exception for anything for work and the need to

7  actually, you know, have a tracking system on it, whatever they

8  need to do, such that she can actually continue to work

9  (background noise obliterates) that this is not someone who

10  has, you know, had real criminal history, and I believe that we

11  can actually do this as far as having those types of

12  restrictions such that she won't have access to the dark web,

13  and if at any point in time anything is accessed, she can be --

14  her release can be revoked.  She is not going to do that.  I

15  mean, you can restrict her usage of any cryptocurrency as well.

16  Those accounts, they can restrict that usage as well, so

17  therefore she won't have any way of paying, because you

18  actually need to do that in order to be able to do any of those

19  transactions.  So if those are restricted as well, then we

20  should be assured that she's not trying to go after anyone in

21  real life.

22         **THE COURT:**  Thank you, Mr. King.  Does that conclude

23  your presentation?

24         **MR. KING:**  Yes, Your Honor.  Thank you.

25         **THE COURT:**  Anything briefly in rebuttal,

1  Ms. Thelwell?

2          **MS. THELWELL:**  Just that, Your Honor, the thought

3  that Ms. Stinson was paying money into a quote "hokey" dark web

4  website because she knew it was fake is ridiculous.  She did

5  not know it was fake.  In fact, when you look at the

6  communications, she is repeatedly asking, "Hey, is this done

7  yet?  I'm going on my trip.  Is this done yet?"  And it goes on

8  for weeks, and the fact that even after at least six weeks of

9  communication she gets a phone call from someone purporting to

10 be a hitman, and she continues to pay additional funds shows

11 that she had the intent, she thought it was real, and it wasn't

12 until the FBI showed up at her door this morning that she

13 realized it wasn't real.

14          And so, Your Honor, again, the Government

15 reiterates its position that these are very serious charges.

16 The facts and the evidence against Ms. Stinson are credibly

17 strong.

18          I want to make sure there's no misinformation.

19 When I looked at 18 USC 1958, what I see is that the maximum

20 penalty is 10 months (verbatim), so I'm not quite sure where

21 Mr. King is getting that information from.

22          But regardless, she has the means to flee, she's

23 a danger to the community, and she should be detained.  Thank

24 you.

25          **THE COURT:**  Mr. King, let me return to you.  Under

1  the theory that the website is a known source of therapy,

2  therapeutic mechanism, is it your proffer that your client had

3  sought to retrieve the 10,000 or was it already -- 12,000, I'm

4  sorry.  Was that already --

5            MR. KING:  I'm not --

6            THE COURT:  You're not required to proffer anything,

7  but you had mentioned that as part of your proffer, so I'll

8  follow up, and you can demure on it.  You can wait until

9  whatever time you wish to answer, if at all.  So I'm not

10  putting on the obligation on you to tender evidence, but if you

11  wish to respond -- if not, you will leave it the way you have.

12            MR. KING:  Your Honor, what I particularly was

13  stating was that based upon even the criminal complaint, it

14  explains in there that people get their money back when nothing

15  is done.  So because of that, they believe that she would be

16  able to get the money back.

17            THE COURT:  Do you proffer -- again --

18            MR. KING:  I --

19            THE COURT:  If I could just finish the thought.  Do

20  you proffer that she has sought the return of the money?

21            MR. KING:  No, Your Honor.

22            THE COURT:  And I appreciate the very fulsome

23  presentations by both sides.  Both sides are represented by

24  accomplished counsel.  Based on the information that's

25  currently before the Court at this time, and I emphasize

```
1    (unintelligible), the Court has not (unintelligible) testimony
2    in the manner which it anticipates it will hear at a
3    preliminary hearing.  I direct then Ms. Stinson that you be
4    detained.
5                 Ms. Stinson, the Court looks at a number of
6    factors in arriving at a determination and will follow up from
7    this proceeding with a written order, but the factors are those
8    referenced by counsel at various points during the course of
9    the presentation.
10                The first factor is the nature and circumstances
11   of the alleged offense.  Here the alleged offense or offenses
12   all involve a crime of violence, and in fact, murder.
13                The second prong or factor that the Court looks
14   at is the nature of the evidence that the Government has, the
15   weight of it relative to those offenses, and for the reasons
16   stated by the Government, the evidence at this point appears to
17   be fairly robust to include text communications, including
18   phone call -- a recorded phone call, rather, the undercover,
19   financial records that are tied to a website on the dark web
20   that advertised (unintelligible) the types of services that are
21   at issue.  Mr. King has pointed out that (unintelligible)
22   something that they (unintelligible).
23                The nature and characteristics of the person
24   who -- that would be you, is the third factor and those largely
25   weigh in your (audio cuts out).  (Unintelligible) criminal
```

1    history, any criminal history, particularly in (audio cuts out)

2    legitimate positions, including your (unintelligible) business

3    out of your house as well.  That factor would appear based on

4    what the Court is aware of at this point to weigh in your

5    favor.

6                    The last factor is the nature and seriousness of

7    the danger to any person or the community that would be posed

8    by your release.  That factor (unintelligible) by the

9    Government weighs against you.  The allegations are that you

10   have endeavored fairly vigorously to (unintelligible) the

11   killing of another individual, in particular somebody connected

12   to a former (unintelligible) allegedly and had gone through a

13   fair amount of effort to carry that out, including the transfer

14   of substantial amount of money, over $12,000.  In addition

15   (unintelligible) money for the purchase of a weapon to the

16   person who represented that they would carry out this homicide.

17                   Based upon all the information that the Court

18   has (unintelligible), including that made by counsel, I'm going

19   to direct that you be detained.  If circumstances should change

20   down the road, there is an avenue for reopening detention

21   (unintelligible), as Mr. King is well aware.

22                   (Unintelligible) preliminary hearing for

23   evidence on the matters in a week and a half.  Between now and

24   then at least, you will be detained.

25                   Anything further from the Government,

1    Ms. Thelwell?

2         **MS. THELWELL:**  No, Your Honor.  Thank you.

3         **THE COURT:**  Mr. King, anything further from the

4    defense?

5         **MR. KING:**  No, Your Honor.  Thank you.

6         **THE COURT:**  Hearing nothing further from the parties,

7    we will be in recess.  Thank you.

8                        (End of proceedings.)

9

10                    * * * * * * * *

11                        CERTIFICATE

12         I, Tana J. Hess, CRR, RMR, Official Court Reporter

13    for the United States District Court, Middle District of

14    Florida, certify that the foregoing is a true and correct

15    transcript of the electronically recorded above proceedings, to

16    the best of my ability.

17

18

19                    _____

20                    Tana J. Hess, CRR, FCRR, RMR
                       Official Court Reporter

21

22

23

24

25