1                  **UNITED STATES DISTRICT COURT**
                  **MIDDLE DISTRICT OF FLORIDA**
2                     **TAMPA DIVISION**

3  UNITED STATES OF AMERICA,

4                 Plaintiff,

5     vs.               CASE NO. 8:21-mj-1955-CPT
                        October 5, 2021
6                        Tampa, Florida
                        1:09 - 3:10 p.m.

7

  DE ANNA MARIE STINSON,

8

                 Defendant.
9  _____/

10

              **TRANSCRIPT OF INITIAL HEARING**
11      BEFORE THE HONORABLE CHRISTOPHER P. TUITE
           UNITED STATES MAGISTRATE JUDGE
12

**APPEARANCES:**
13

  For the Government:     LISA MARIE THELWELL, ESQ.
14                    Assistant U.S. Attorney
                    400 N. Tampa Street, Suite 3200
15                    Tampa, Florida 33602
                    813/274-6000
16

  For the Defendant:      ALEC FITZGERALD HALL, ESQ.
17                    NICOLE VALDES HARDIN, ESQ.
                    PERCY KING, ESQ.
18                    Assistant Federal Defenders
                    400 N. Tampa Street, Suite 2700
19                    Tampa, Florida 33602
                    813/228-2715
20

  Court Reporter:         Howard W. Jones, RDR, RMR, FCRR
21                    801 N. Florida Avenue, Suite 15A
                    Tampa, Florida 33602
22                    813/301-5024

23

24  Proceedings transcribed via courtroom digital audio
  recording by transcriptionist using computer-aided
25  transcription.

**I N D E X**

                                              **PAGE**


TESTIMONY OF JULIO FUENTES
   Direct Examination by Ms. Thelwell:          14
   Cross-Examination by Mr. Hall:               48
   Redirect Examination by Ms. Thelwell:        78

CERTIFICATE OF COURT REPORTER:                  84


* * * * * * * * * *


**E X H I B I T S**

| GOVERNMENT EXHIBIT NO. | IDENTIFIED | PAGE RECEIVED |
|---|---|---|
| 1 | 45 | 46 |


* * * * * * * * * * *


UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

P R O C E E D I N G S

1

2          (Court called to order.)

3          THE COURT:  Good afternoon, everyone.

4          Madam Clerk, if you could please call the case.

5          THE DEPUTY CLERK:  United States of America vs.

6  De Anna Marie Stinson, Criminal Case No. 8:21-mj-1955.

7          THE COURT:  If I could please have the appearances

8  of counsel for the record beginning with the plaintiff -- or

9  the government, rather.

10          MS. THELWELL:  Good afternoon, Your Honor.  Lisa

11  Thelwell on behalf of the United States.

12          THE COURT:  Good afternoon.

13          MR. HALL:  Good afternoon.  Alec Hall on behalf of

14  Ms. Stinson.  She's present in the courtroom.  Also with me

15  are my trial partners, Percy King and Ms. Nicole Hardin.

16          THE COURT:  Good afternoon to you all.

17          Good afternoon, Ms. Stinson.

18          I want to apologize to the parties from the

19  outset.  The Court took a few minutes to do some preliminary

20  research relative to the elements of the two offenses

21  charged in the complaint.

22          Ms. Thelwell, what are the elements for those two

23  offenses?

24          MS. THELWELL:  One moment, Your Honor.

25          THE COURT:  Once Ms. Thelwell provides the

1    government's view of those elements for the two offenses

2    listed in the complaint, the Court will look to the defense

3    as to whether it agrees.

4            MS. THELWELL:  Your Honor, as to murder for hire,

5    18 U.S.C. -- in violation of 18 U.S.C. 1958, there is no

6    Eleventh Circuit pattern, so I am relying on a pattern jury

7    instruction from another circuit.  The elements are:

8            The defendant -- one, the defendant used mail or

9    any facility of interstate or foreign commerce;

10           Second, the defendant did so with the intent that

11   a murder be committed in violation of the laws of any state

12   or the United States, and in this case it would murder under

13   Florida law in violation of Florida Statute 782.04(1)(a)(1).

14           THE COURT:  Okay.  Mr. Hall, any disagreement as

15   to the elements of Section 1958?

16           MR. HALL:  I don't at this time, Judge.  We'll

17   continue to evaluate it.  We feel at this time under *Gates*

18   there's a sufficient basis for the arrest.  And as to your

19   question regarding the elements, we don't take dispute with

20   the elements.

21           THE COURT:  Okay.

22           MR. HALL:  But again, we will continue to monitor

23   as we go.

24           THE COURT:  It could be the case that the Court is

25   going to make a probable cause determination here in open

1    court and that would be the time, if the defense disagrees

2    with the recitation of elements, for it to make argument

3    about whether the probable cause standard has been

4    satisfied.

5              MR. HALL:  Right.

6              THE COURT:  It would need to address the elements.

7    So --

8              MR. HALL:  Yeah.

9              THE COURT:  -- I understand there's some hesitancy

10   about articulating that perhaps --

11             MR. HALL:  Right.

12             THE COURT:  -- at this immediate moment, but --

13             MR. HALL:  Well, Judge, let me say it this way:

14   What I'm meaning to say is that we're gonna continue to

15   evaluate our case separate from whatever happens today.  But

16   at this juncture, we have -- we don't dispute the elements

17   that Ms. Thelwell indicated.

18             THE COURT:  Okay.  Thank you, Mr. Hall.

19             And then as to the solicitation charge,

20   Ms. Thelwell?

21             MS. THELWELL:  Your Honor, with this charge I do

22   want to be candid with the Court.  Since the complaint was

23   obtained and I was in the process of seeking an indictment,

24   in discussing the charges with our appellate unit, the

25   attorneys in our appellate unit, we learned that -- or I

1    learned, I should say, 18 U.S.C. 373, which is charged in

2    the complaint, solicitation to commit a crime of violence,

3    the legal definition of what is considered a crime of

4    violence and whether or not murder for hire fits under that

5    category is not legally sound.  And so for that reason, the

6    United States, when seeking an indictment, will not be

7    pursuing that count, we will only be pursuing 18 U.S.C.

8    1958.

9           THE COURT:  And just to be clear, the complaint

10   here was filed on September 22nd.  When did it come to the

11   government's attention that a charge for which it submitted

12   a complaint to a judicial officer did not satisfy the

13   elements for that offense?

14          MS. THELWELL:  That would have been the following

15   Monday.  I don't have that date in front of me.

16          THE COURT:  Okay.  So I hear you to say,

17   Ms. Thelwell, that the only charge that the government is

18   proceeding on for purposes of this hearing is Section 1958

19   of Title 18 of the United States Code?

20          MS. THELWELL:  That's correct, Your Honor.

21          THE COURT:  Okay.  Mr. Hall, anything you wish to

22   add in that regard?

23          MR. HALL:  I don't, Judge.

24          THE COURT:  Okay.

25          MS. THELWELL:  And for the record, Your Honor, I

1  did previously advise Mr. Hall of that fact.

2          THE COURT:  About the --

3          MS. THELWELL:  Regarding the abandonment of

4  18 U.S.C. 373.

5          THE COURT:  What specifically is the issue as to

6  whether murder for hire is not a crime of violence?

7          MS. THELWELL:  My understanding is when looking at

8  the definition of crime of violence and looking at the --

9  the underlying crime is can murder for hire be committed in

10  a way that is nonviolent and technically submitting -- or

11  soliciting a murder -- orchestrating a murder for hire can

12  be done in a nonviolent manner.  It's our office's position

13  at this time that pursuing an indictment only on 18 U.S.C.

14  1958 is a lot more legally sound than potentially also

15  adding 18 U.S.C. 373.  Not that we would not ultimately

16  prevail, but that there could be appellate issues that are

17  not really worth it in this particular case.

18          THE COURT:  Okay.  Anything further from either

19  side before we get started?

20          Ms. Thelwell?

21          MS. THELWELL:  No, Your Honor.

22          THE COURT:  Thank you.

23          Mr. Hall.

24          MR. HALL:  Yeah, Judge.  On my cross-examination,

25  do you want to leave it generic victim X or is it okay to

1 use names?  I don't know what Your Honor would prefer.

2          THE COURT:  Let me begin with Ms. Thelwell, you

3 know the investigation best here.  What do you suggest by

4 way of identifying the victim?

5          MS. THELWELL:  I would ask that we use what's in

6 the complaint, as right now that's the only thing in the

7 public record and I know that this case has picked up some

8 media attention, so I'd like to keep the victim's out of the

9 media if possible.

10          THE COURT:  Any objection, Mr. Hall?

11          MR. HALL:  Well, let me ask you this.  I would

12 prefer if I could use -- ask the officer, the agent, the

13 name of the victim in the case.  So that's my first request,

14 if you would allow me to do that.

15          THE COURT:  Is there a reason why referring to the

16 victim as victim X would be detrimental to your defense at

17 all?

18          MR. HALL:  Well, is it a real person, is it a fake

19 person, or anything of that nature?  I think at this time

20 under *Gates* I should be allowed to at least ask the name and

21 confirm that we're talking that that person does in fact

22 exist and I'd like to be specific in identifying that

23 person.

24          THE COURT:  Are you aware of the name and identity

25 of the victim here?

1          MR. HALL:  I have my suspicions, Judge, but I

2     don't know that, I have not -- that information has not been

3     officially revealed to me at all.  I don't know if we can do

4     it unofficially, but I certainly wanted to ask Your Honor

5     first and get some direction.  But I don't have an official

6     designation or specification of the person coming from the

7     government.

8          THE COURT:  Okay.  Ms. Thelwell?

9          MS. THELWELL:  Your Honor, I previously spoke with

10    Mr. Hall and advised -- I can't recall, you know, if I named

11    the victim by name, her government name, when I spoke to

12    him, but I did advise the nature of the relationship between

13    the victim and the defendant.  I am happy to write on a

14    piece of paper for Mr. Hall's own benefit and his counsel --

15    and co-counsel's benefit the name of the victim.

16          I think that maybe we can readjust this at a time

17    when Mr. Hall feels it might be necessary during

18    cross-examination.  I do plan to establish who the victim --

19    the fact that the victim is a real live person through my

20    direct testimony -- direct examination, so that would answer

21    any of his questions there.  But I don't think that there is

22    any reason for probable cause determination purposes to put

23    the victim's name in the public record at this time.

24          THE COURT:  Let me suggest if I could -- and,

25    Mr. Hall, I'll then look to you -- and that is, if

1   Ms. Thelwell disclosed to you here verbally the name of the

2   victim and then you can --

3            MR. HALL:  Okay.

4            THE COURT:  -- use the victim's initials.

5            MR. HALL:  Okay.  That's fine.

6            THE COURT:  Which is typically done.

7            Ms. Thelwell, any disagreement there?

8            MS. THELWELL:  No, Your Honor.

9            THE COURT:  Any disagreement, Mr. Hall?

10           MR. HALL:  That would be fine.  Now, secondly -- I

11  think that will -- that'll be fine, Judge.  That'll be fine.

12           THE COURT:  Okay.  So just to be clear, moving

13  forward, Ms. Thelwell, we'll give you a moment to disclose

14  to Mr. Hall, if you haven't already, and I understand that

15  per Mr. Hall that you have not, the identity of the victim

16  here and then heretofore we will refer to the victim by the

17  victim's initials.  First --

18           MR. HALL:  And finally -- I'm sorry.  I'm sorry.

19           THE COURT:  The initials being first name and last

20  name.

21           MR. HALL:  Okay.

22           THE COURT:  Yes, Mr. Hall.

23           MR. HALL:  Okay.  So this is confirmation here.

24  So the only other issue would be is it okay if I refer to

25  the ex-boyfriend/spouse of the alleged victim by name or do

 1  you want that out of the record as well?

 2          THE COURT:  Ms. Thelwell?

 3          MS. THELWELL:  I would ask that we use initials.

 4          THE COURT:  Mr. Hall, any disagreement?

 5          MR. HALL:  I can move on with it.  That's not a

 6  victim, but I'll move on for the sake of time.

 7          THE COURT:  If you want to make argument as to the

 8  reason for having to do it, if the using of the initials is

 9  accepted -- acceptable, rather, to you, then we can move

10  forward.  I'll leave it to you --

11          MR. HALL:  The initials --

12          THE COURT:  -- to decide how you best with to

13  proceed.

14          MR. HALL:  The initials will be fine.  Thank you

15  so much.

16          THE COURT:  Okay.  And do you each know the

17  initials of -- and I don't know that I fully understand the

18  attenuated relationship here, of the individuals to whom

19  Mr. Hall is referring.

20          Ms. Thelwell, do you know to whom he's referring?

21          MS. THELWELL:  Yes, Your Honor.  The victim's

22  initials for the record are C.H. and the other individual,

23  the spouse of the victim, is S.H.

24          THE COURT:  F as in Frank, T as in Tango.

25          MS. THELWELL:  S as in Sam.  S as in Sam, H as in

1   hi.  Sorry.

2          THE COURT:  Okay.  So it's an alleged victim here,

3   C.H.  And S.H. is the spouse of the alleged victim, C.H.  Do

4   I understand that correctly, Ms. Thelwell?

5          MS. THELWELL:  Yes, Your Honor.

6          THE COURT:  Okay.  Mr. Hall --

7          MR. HALL:  I agree.

8          THE COURT:  -- is that your understanding as well?

9          MR. HALL:  I agree.

10          THE COURT:  Okay.  Hearing nothing further from

11   the parties, Ms. Thelwell, if you'll call your first

12   witness.

13          MS. THELWELL:  Your Honor, the United States calls

14   Special Agent Julio Fuentes.

15          THE COURT:  Mr. Fuentes, if you would kindly come

16   forward and approach my courtroom deputy so that you can be

17   sworn.

18          (Witness sworn by the Deputy Clerk.)

19          THE WITNESS:  Yes.

20          THE DEPUTY CLERK:  Agent Fuentes, if you'll please

21   take a seat over there and then state your name for the

22   record.

23          THE COURT:  Mr. Agent, you'll see that there's a

24   microphone that will be immediately in front of you.  If you

25   could adjust the microphone to the height that is

1    appropriate for you and speak into the microphone, but you

2    don't have to get too close.  Because you are a witness,

3    you'll need to remove your mask so the Court can assess your

4    credibility.

5              For the record, the witness stand where the

6    witness is currently sitting is more than six feet removed

7    from any other individual in the courtroom.

8              And for counsel, I'm happy to entertain any

9    concerns anybody has, but the Court would prefer that when

10   counsel is at the lectern, only at the lectern, that they

11   remove their mask.  The only way the Court can record the

12   proceedings here is through the microphones and having

13   conducted a trial a month ago, the jury and the Court

14   struggled sometimes with counsel utilizing a mask at the

15   lectern.  I want to make sure everybody feels safe.

16             In doing that, Ms. Thelwell, do you feel

17   comfortable yourself and opposing counsel only at the

18   lectern when they are facing the Court or the witness and

19   not directed towards counsel's table, which is more than six

20   feet away, proceeding without a mask.

21             MS. THELWELL:  Yes, Your Honor.

22             THE COURT:  And Mr. Hall.  Thank you.

23             MR. HALL:  That's fine.  What is your preference

24   here at counsel's table or in your courtroom?

25             THE COURT:  I think that as long as people are not

1    at the lecturn, I think the wiser course here is for

2    everybody to stay masked.  So we'll proceed that way.

3              Ms. Thelwell.

4              MS. THELWELL:  Yes, Your Honor.

5                        **DIRECT EXAMINATION**

6    BY MS. THELWELL:

7    Q.   I can't recall if you've already spelled your name for

8    the record.

9    A.   I have not.  First name is Julio, J-u-l-i-o.  Last name

10   is Fuentes, F-u-e-n-t-e-s.

11             MS. THELWELL:  I apologize, Your Honor.  Has he

12   been sworn?  I don't remember that happened.

13             THE COURT:  He has been sworn.

14             MS. THELWELL:  Okay.  Thank you.

15   BY MS. THELWELL:

16   Q.   Could you please tell us where you work?

17   A.   Sure.  I'm a special agent with the FBI.  I'm currently

18   assigned to the Miami Division.

19   Q.   How long have you been assigned to the Miami Division

20   of the FBI?

21   A.   I've been assigned to the Miami Division since 2008.

22   Q.   And what type of cases do you investigate?

23   A.   Currently I work violent crimes and white collar

24   matters.

25   Q.   And how long have you been doing those types of

1    investigations?

2    A.   Approximately three years.

3    Q.   Prior to that assignment, what were you doing?

4    A.   Prior to that I was assigned to the Counterterrorism

5    Division and prior to that I worked on white collar crimes

6    and cyber crimes.

7    Q.   Outside of being a special agent with the FBI, do you

8    have any other law enforcement experience?

9    A.   I do.  Prior to being a special agent with the FBI, I

10   was assigned as an FBI police officer up in Washington, D.C.

11   Q.   As a special agent with the FBI, have you had the

12   opportunity to investigate murder for hire investigations?

13   A.   Yes.  To assist in investigations, yes.

14   Q.   Okay.  Are you involved in the investigation into

15   De Anna Marie Stinson?

16   A.   I am.

17   Q.   How did you become involved in this investigation?

18   A.   The FBI Miami Division received a complaint or a tip

19   from the FBI Knoxville Division.  The FBI Knoxville Division

20   has -- currently has a source of information that provided

21   them with information on a murder-for-hire attempt that was

22   done on a website.  So FBI Knoxville contacted FBI Miami,

23   because they believed that the potential victim was located

24   in Miami -- FBI Miami's area of responsibility, so they

25   contacted FBI Miami and let them know about the potential

```
 1   murder-for-hire case.
 2              THE COURT:  If you could hold, Ms. Thelwell.
 3              Agent, how do you spell the entity that received
 4   or does receive tips?
 5              THE WITNESS:  Yes, Your Honor.  It's FBI Knoxville
 6   Division, Knoxville, Tennessee.
 7              THE COURT:  Oh, Knoxville.
 8              THE WITNESS:  Yeah, it's a field office of the
 9   FBI.
10              THE COURT:  Okay.  Thank you.
11              Ms. Thelwell.
12   BY MS. THELWELL:
13   Q.  All right.  So your office received a tip from FBI
14   Knoxville?
15   A.  Correct.
16   Q.  All right.  And have you had an opportunity to review
17   the information that was originally provided to your office
18   from FBI Knoxville?
19   A.  I have.
20   Q.  What type of information was provided in that tip?
21   A.  They provided information that came from a website that
22   operated on the dark web.  FBI Knoxville's source of
23   information has access to the information posted on that
24   website.  Whether it's available to the public or not
25   available to the public, the FBI Knoxville source of
```

1   information has access to that information, to include when

2   somebody goes on that website and places what we call an

3   order or, in this case, you know, provides the name of a

4   person they want murdered.  The FBI Knoxville source of

5   information has that information and provides it to the

6   agent in FBI Knoxville that the source of information has a

7   relationship with.

8   Q.   All right.  Before we get into more -- further details

9   about the information that this source provided to FBI

10  Knoxville, would you also describe this source as being a

11  confidential human source?

12  A.   That's correct, yes.

13  Q.   Is that a term that you use at your agency?

14  A.   It is, yes.

15  Q.   What does that term mean?

16  A.   That term is -- in other agencies could be known as an

17  informant.  In our agency it's known as a confidential human

18  source or CHS.  That's a person that has a relationship with

19  the FBI and provides information to the FBI in a

20  confidential matter.  We do that to protect the individual,

21  so we can protect the individual's name and the individual's

22  identity in reports or, you know, other documentation.

23  Q.   Okay.  And so is there some sort of formalized process

24  in order for an individual or individuals to become a CHS?

25  A.   Yes, there is.

1  Q.   And are there special rules and admonishments that are

2  provided to the CHS?

3  A.   Yes.

4  Q.   How frequently?

5  A.   At a minimum, on an annual basis.

6  Q.   Throughout this investigation, have you had any direct

7  contact with the CHS?

8  A.   I have not.

9  Q.   Do you know who the CHS is?

10  A.   I do not.

11  Q.   Is the CHS someone who works with FBI Miami?

12  A.   Not to my knowledge, no.

13  Q.   Okay.  So based on your information, who

14  specifically -- or I guess which part of your agency does

15  the CHS work with?

16  A.   The FBI Knoxville Division.

17  Q.   Okay.  What information, according to FBI Knoxville,

18  did the CHS provide to the FBI?

19  A.   The CHS from Knoxville provided a picture and a

20  description, as well as some instructions that someone --

21  someone went on this website on the dark web and put in

22  there.  In other words, somebody filled out an order form on

23  this website and provided a photograph, a description, an

24  address, and instructions on what to do with this person.

25  Q.   Did they also provide a name of the potential or the

1    intended target victim?

2    A.    They did, yes.

3    Q.    You indicated that your office was contacted because it

4    was believed that the victim lived within your area?

5    A.    That is correct.

6    Q.    So based on your knowledge, this CHS has access to the

7    administrators of the website?  Or how would you phrase

8    that?

9    A.    I would phrase that as the CHS has access to what is --

10   what is documented within the website, that is the orders

11   placed and any communication that a user of the website has

12   with administrators of the website.

13   Q.    Are you aware if the CHS has previously provided the

14   FBI with information from the website apart from this

15   investigation?

16   A.    I am, yes.

17   Q.    Are you aware of whether or not the information that

18   the CHS has provided about other investigations was

19   subsequently corroborated?

20   A.    Yes.  It has been, yes.

21   Q.    Let's talk about the website.  You indicated that it

22   exists on the dark web?

23   A.    Correct.

24   Q.    Can you just briefly give us a high level overview of

25   what the dark web is?

20

1   A.   The dark web is -- is within the internet itself.   A

2   user or somebody with a web browser needs to connect to a

3   certain secure web browser, in this case it's called the

4   Tour Network.   So once you log onto the Tour Network, you

5   are then able to access websites within this network that

6   are referred to as dark websites or dark net websites.

7   Q.   Okay.   And this is not something that's public -- this

8   is not something that you can just do a Google search for,

9   correct, a website?

10   A.   No, a Google search would not reveal any websites

11   within the dark web.

12   Q.   Okay.   So I think you indicated you have to have a

13   special browser called a Tour browser?

14   A.   Correct.

15   Q.   For the Onion router?

16   A.   Correct.

17   Q.   All right.   Prior to this investigation, receiving this

18   tip, were you familiar with the website, as we will continue

19   to refer to it throughout the hearing?

20   A.   I was not familiar with the website, no.

21   Q.   At some point in the investigation, did you access the

22   website?

23   A.   Yes.

24   Q.   How did you do that?

25   A.   Using an undercover laptop, that is a laptop that's not

1  registered to the government, I logged onto the Tour

2  Network -- the Tour Network, and then I was able to access

3  the website using the websites unique URL.

4  Q.   Can you describe what you mean by the unique URL for

5  the website?

6  A.   URL is just simply an address tool website, like

7  Google.com.  In this case we received a unique URL.  Usually

8  it's a long text string.  We received that from the source

9  of information in Knoxville.  I was able to plug that into

10 my browser and I accessed the website.

11 Q.   And generally speaking, as it relates to websites

12 contained on the dark web, are they generally long

13 alphanumeric strings?

14 A.   From my experience, yes.

15 Q.   Okay.  And so based on your experience, are they web

16 addresses that are easily remembered?

17 A.   They're not, no.

18 Q.   Okay.  You mentioned that you used your undercover

19 computer to access this website.  Did you act in your

20 undercover capacity at any point in this case?

21 A.   I did not, no.

22 Q.   Once you typed in the unique URL that you had received

23 that belongs to the website, what did you observer, if

24 anything?

25 A.   I just want to clarify one thing.  Once you do log into

1  the Tour Network and are on a browser, there is Google-like

2  search engines within the dark web.  So another way to get

3  to websites if you don't know the URL is to conduct

4  searches.  Again, a Google search would not give you access

5  to these sites on the dark web, but once you log into the

6  Tour Network, they do have browsers within the network to

7  search.

8  Q.   Okay.  So they have --

9  A.   I wanted to clarify that.

10  Q.   Thank you.  So would you say they have their own

11  Google-like --

12  A.   Correct, they have --

13  Q.   -- menus to surf the dark web?

14  A.   Yes, they have their own search engines.

15  Q.   Okay.  Thank you for clarifying.  Once you were able to

16  log onto the website, what, if anything, did you observe?

17  A.   I observed the website, you know, typical of a website

18  with, you know, specific links, like home, FAQ, frequently

19  asked questions, had a forum site, then it had like an order

20  section.  Had links that looks like a website anybody can

21  use, very user friendly.  I observed right at the home page

22  or some people refer as a stash page, it was -- it was very

23  clear that this was a murder-for-hire site.  In other words,

24  the site you would go on and try to find someone to kill

25  another person.  In fact, there was, like I said, an FAQ

1  section which described what the site was, to include why it

2  was reliable, why it wasn't a site operated by law

3  enforcement, why if one went on there and placed an order

4  they could not be traced by law enforcement.  That was all

5  explained in the FAQ section.

6  Q.    Okay.  You mentioned that there was also a forum page

7  that was visible to a public viewer like yourself?

8  A.    Correct.  On the website, one of the links was to a

9  forum, a forum being somewhere where people can go on there

10  and post comments or ask questions and one can reply to

11  those question.  Again, anybody could see that.  I did

12  not -- I did not have to create a special user name or have

13  a password to that section of the website, you could just

14  click on it and go through there and read, read what others

15  are saying about the website or what others are asking about

16  the website.  That was available on the website.

17  Q.    Did you observe any public posts on the main forum page

18  that were relevant to this investigation?

19  A.    I did, yes.

20  Q.    What did you see?

21  A.    So when FBI Knoxville provided us the information on

22  this particular threat or attempt to hire a hitman, they

23  provided a user name of the user that placed this order.

24  That user name is Touche081970.  I went browsing the forum

25  part of the website.  I myself, I found a comment or a post

1   made on that forum by this specific user, Touche081970.

2   That post was titled I think, if I can refer back to the --

3   it was titled Need a Job, or something along those lines.

4   And then it stated that they needed somebody to do a quick

5   job in South Florida.

6   Q.   All right.  So did you receive any additional

7   information from FBI Knoxville that was provided by the CHS?

8   A.   Yes, I did.  The CHS, through FBI Knoxville, provided

9   us with, again, the user name, the payments made from this

10  user name to the website, and also provided all the

11  communications between this user and the administrators of

12  the website aside from the forum communications.  So the

13  user communications that the public would not see.  These

14  are unavailable to the public, it's communications between

15  the user and the administrators of the website, such as

16  direct messages where the users of the website could ask

17  questions or inquire about the status of their jobs.  Those

18  were provided to us specifically about this user name.  They

19  were provided to us by FBI Knoxville.

20  Q.   And did you also receive communications between the

21  Touche081970 account, between that account and hitmen or

22  vendors as they're called?

23  A.   Yes.

24  Q.   Did you also receive in that information any bitcoin-

25  related information associated with the Touche081970

1  account?

2  A.   Yes, we received the bitcoin transactions that were

3  made from the Touche081970 user and the website.  So

4  transactions made between the user and the website, those

5  bitcoin transaction details were provided to us.

6  Q.   Did you have an opportunity to review all of that

7  information?

8  A.   I did, yes.

9  Q.   Based on the documents that you reviewed, when -- on or

10  about what date was the Touche081970 account created?

11  A.   It was sometime in June of this year.

12  Q.   And did you also review the communications?

13  A.   I did, yes.

14  Q.   Generally, what did you observe in the communications?

15  A.   Mostly two things were in those communications.  A lot

16  of the communications were about payment and, you know,

17  going through the payment forms.  In other words, the user

18  would ask the administrators if, you know, test payments

19  were made or received or asked them details about how to

20  make the payments.

21       The other communications were about the job itself.

22  There was several communications about why hasn't the job

23  gotten done.  There were statements in those communications

24  about needing the job -- needed the job being done ASAP.

25  There was even specifics about when the job was supposed to

1  get done, to include an offer from the user Touche081970 of

2  providing a bonus if the job was done before a certain date.

3  Q.   Did the -- based on your review of the messages, did

4  the account user for Touche081970 appear to be consistent --

5  or persistent with their requests --

6  A.   Yes.

7  Q.   -- to the website?

8  A.   Yes.

9  Q.   In the communications, did the Touche081970 account

10  indicate whether or not they were ready to proceed with the

11  transaction?

12  A.   Yes.

13  Q.   More than once?

14  A.   Yes.

15  Q.   At any point in the communications, did the

16  Touche081970 account request that the job be reassigned to

17  someone who had a history of getting the job done?

18  A.   Correct.  The job hadn't gotten done according to what

19  the user wrote and the user wanted the order or the job

20  reassigned to another vendor and specifically he said a

21  vendor with a history of getting jobs done.

22  Q.   You also mentioned that the information provided by the

23  CHS contained payments and transaction history from the

24  Touche081970 account?

25  A.   Correct, yes.

1   Q.   Generally, what can you tell us about the transaction

2   history of that account?

3   A.   The transaction history showed multiple transactions

4   via bitcoin.  In other words, bitcoin payments made from a

5   currency exchange to the website.  So the website had

6   specific bitcoin addresses used, unique bitcoin addresses

7   provided to a user so a user can send bitcoin payments too.

8   Q.   And keeping this very high level and general, what

9   is -- what is bitcoin?

10  A.   Bitcoin is a virtual currency.

11  Q.   Okay.  And so approximately how much money in -- how

12  much money in U.S. dollars was sent to the website via

13  bitcoin?

14  A.   According to what the source of information provided

15  us, it was a little over $12,000, U.S. dollars.

16  Q.   And over approximately how many transactions?

17  A.   Five.  Approximately five transactions.

18  Q.   Based on this information -- and actually, let me back

19  up.

20       Within the information that the CHS provided, did they

21  provide the specific transaction details that included the

22  bitcoin addresses associated with each transaction?

23  A.   They did, yes.

24  Q.   What, if anything, did the FBI do with those bitcoin

25  addresses associated with the Touche081970 account?

1   A.   Those bitcoin addresses were provided to FBI

2   headquarters, who has a unit or a team of people that can --

3   that track the bitcoin transactions.  It's called chain

4   analysis.  So they had somebody do a chain analysis on the

5   unique bitcoin address used to receive payment.

6   Q.   When you say chain analysis, you're talking about a

7   specific software program that conducts block chain

8   analysis; is that correct?

9   A.   Correct, yes.

10  Q.   Okay.  All right.  You said that there's a team of

11  individuals within the FBI and that their sole job is to

12  kind of work those types of investigations; is that correct?

13  A.   Yes.

14  Q.   Are you able yourself to conduct a block chain

15  analysis?

16  A.   I am not, no.

17  Q.   Okay.  So you have not been trained in block chain

18  analysis; is that correct?

19  A.   I have not.

20  Q.   Okay.  Did the individuals who are trained and did in

21  fact conduct the block chain analysis in this case

22  ultimately provide you with any information from that

23  analysis?

24  A.   Yes.

25  Q.   What, if anything, did you learn subsequent to that

1  analysis?

2  A.   The individuals that conducted the chain analysis were

3  able to determine that the payments sent -- the bitcoin

4  payments sent to the website originated from Coinbase.

5  Coinbase is a currency exchange.  Simple way to explain that

6  is, you know, Coinbase can turn U.S. dollars into bitcoin.

7  So the chain analysis was able to identify that the money

8  originated from a Coinbase account.

9  Q.   What can you -- well, you mentioned Coinbase is a

10  virtual currency exchange.  Do you know whether or not

11  Coinbase is considered a financial institution where they

12  have to follow the Anti-Money Laundering Act?

13  A.   My understanding, yes.  Yes, they are.

14  Q.   And does that mean that they need to provide or

15  maintain information about their customers?

16  A.   Yes.

17  Q.   What type of information are they required to keep?

18  A.   My understanding is they're required to keep a person's

19  true identity, so their name, address, basic subscriber

20  account holder information, to include some kind of

21  identifiers, date of birth, Social Security number, email

22  address, telephone number, and some form of identification,

23  a copy of driver's license, passport, et cetera.

24  Q.   Once Coinbase was identified as being associated with

25  at least one of the bitcoin addresses from the Touche081970

1    account, what, if anything, did the FBI do?

2    A.   The FBI in this case was FBI Knoxville.  They reached

3    out to Coinbase due to the exigent circumstances in this

4    case; in other words, somebody's trying to have somebody

5    killed.  Coinbase was able to provide basic information, in

6    this case the subscriber information, a name and an account

7    for the person behind the Coinbase account.

8    Q.   What name did they provide to FBI Knoxville at that

9    time?

10   A.   At that time they provided the name De Anna Stinson.

11   Q.   Okay.  What happens after FBI Knoxville obtained that

12   first round of subscriber information?

13   A.   The FBI then followed up with Coinbase and provided a

14   legal process, in this case a grand jury subpoena, for

15   Coinbase to provide us all the subscriber and transactional

16   history they had on this Coinbase account user.

17   Q.   And did you have an -- well, did they respond to that

18   request?

19   A.   They did, yes.

20   Q.   And have you had an opportunity to review the records

21   that were provided?

22   A.   Yes.  Yes.

23   Q.   What information did they provide as it relates to the

24   subscriber of that account?

25   A.   Again, they provided us simple subscriber information,

1    name, address, telephone number, email address.  They

2    provided bank account, that is the actual bank account

3    linked to the Coinbase account.  They provided transactional

4    logs and mostly IP addresses used to connect to the Coinbase

5    app or website.  That included payment history, payments --

6    or transfers sent into the Coinbase account, transfers sent

7    out of the Coinbase account and, again, any IP addresses

8    used to conduct those transactions.

9    Q.   Did they also provide the date of birth of the

10   individual associated with the account?

11   A.   Yes.

12   Q.   Now, you mentioned earlier that they provided photo

13   verification?

14   A.   Correct, they provided a couple of photos.  One was a

15   photo -- it was a driver's license photo, a driver's license

16   provided by the user, in this case Ms. Stinson.  They also

17   provided profile pics, they're -- I would describe them as

18   like selfie-style pictures needed as verification when you

19   conduct a transaction; in other words, you want to make a

20   transfer or you want to send payments out, you've gotta

21   verify your identity.  You do so by taking a picture of

22   yourself.

23   Q.   Well, let me -- let me ask you a question about that.

24   When you are creating a Coinbase account, in the process of

25   creating the account, is that when the photo verification

1   takes place?

2   A.   In the creating the account I believe you provide

3   identification, a photo identification.

4   Q.   So in this case, based on the Coinbase records that

5   were provided, what did Ms. Stinson provide to verify her

6   identity?

7   A.   In this case it was a Florida driver's license.

8   Q.   Okay.   And throughout your investigation, have you had

9   an opportunity to run her driver and vehicle information

10  through the database?

11  A.   Sure, yes.

12  Q.   And so were you able to view her driver's license?

13  A.   Yes.

14  Q.   The driver's license photo that was stored in the

15  Coinbase records, did that match the driver's license of

16  the -- of Ms. Stinson?

17  A.   Yes.

18  Q.   And the photos that you talked about, the selfie-style

19  images, who were -- who was depicted in that photo?

20  A.   Ms. Stinson.

21  Q.   Okay.   And so based on your comparison of the driver's

22  license photo to the selfie-style photo, would you say that

23  they were the same person?

24  A.   Yes.

25  Q.   And we'll get to it later, but at some point you

1    eventually met Ms. Stinson in person; is that correct?

2    A.    Yes.

3    Q.    And do you see her here in the courtroom today?

4    A.    Yes.  Yes.

5    Q.    Would you please identify her?

6    A.    Sitting right there in that orange jumpsuit.

7              MS. THELWELL:  Let the record reflect that the

8    witness has identified the defendant in this case.

9              THE COURT:  You may proceed.

10   BY MS. THELWELL:

11   Q.    And the defendant that's sitting there at the table, is

12   that the same individual that you observed in the photos

13   from the Coinbase records?

14   A.    Yes, it is.

15   Q.    Apart from the account identifiers, you said that there

16   was also transaction logs that showed the history of, you

17   know, money moving in and out of the account or bitcoin

18   moving in and out of the account; is that correct?

19   A.    Correct, yes.

20   Q.    Did you observe any bitcoin transactions that appeared

21   to be associated with the website?

22   A.    I observed transactions that were associated with

23   unique bitcoin addresses provided from the website, yes.

24   Q.    Okay.  And I don't think we touched on this, but when

25   you say the unique bitcoin addresses, can you just explain

1  what you mean by that?

2  A.   So the website -- the website, generally addresses,

3  they're a string of digits and characters and letters for

4  users of the website to provide payment.  In other words,

5  you sent your payments, in this case Coinbase payments from

6  Coinbase, to these unique addresses that's generated somehow

7  by the website.  Those unique -- those unique strings of

8  characters could also be seen on the Coinbase transaction

9  logs.

10  Q.   Okay.  And so would you compare a bitcoin address, a

11  BTC address, with the unique alphanumeric characters,

12  similar to like a bank account number?

13  A.   Correct.

14  Q.   Okay.  So it's some specific number that ties back to a

15  bitcoin wallet or account that's going to be accepting and

16  receiving payment; is that correct?

17  A.   Correct.

18  Q.   So you stated that within the Coinbase records you

19  observed some bitcoin addresses that you know through the

20  investigation are associated with the website; is that

21  correct?

22  A.   Yes.

23  Q.   What, if anything, did you observe about the IP logs

24  that were contained within those records?

25  A.   The IP logs contained several IP addresses --

1  Q.   Let me actually just stop you.  Can you just give us --

2  make sure everybody's on the same page.  What is an IP

3  address?

4  A.   So an internet protocol address is a series of numbers.

5  Typically, a series of numbers that identifies or resolves

6  to either a website or a computer server.  Again, it's much

7  like an account number, it's unique.  It's unique to a

8  certain website or to a certain device on the internet.

9  Q.   And so essentially, does an IP address help you as an

10  agent or an investigator locate a specific device?

11  A.   It could, yes.

12  Q.   What, if anything, did you observe or what stood out to

13  you relevant to this investigation regarding the IP

14  addresses?

15  A.   Two things.  Analyzing the -- actually, three things.

16  Analyzing the IP addresses, one, a lot of the IP addresses

17  resolved to a VPN, so that didn't provide anything relevant

18  at the moment.  But the second thing was there was IP

19  addresses making transactions that resolved to Charter

20  Communications in Tampa.  And three, there was IP addresses

21  that -- making transactions on the Coinbase account

22  belonging to Ms. Stinson that resolved to Hawaii Telecom in

23  Hawaii.

24  Q.   As it relates to Hawaii, did you obtain any travel

25  records in this investigation?

1   A.    I did, yes.

2   Q.    What specifically did you find?

3   A.    I found records provided by Delta Airlines that

4   Ms. Stinson flew from Tampa, final destination Honolulu, on

5   July 5th and returned on approximately July 11th, returned

6   to Tampa.

7   Q.    Why did those travel dates stand out to you?

8   A.    So July 5th through 11th stood out because on the

9   original information we received from FBI Knoxville, which

10  provided us the order, the order being the information the

11  user provided related to the victim and job they wanted --

12  they wanted done, on that order the user, Touche081970,

13  provided specific instructions on what they wanted done.

14  For example, they provided the address of the victim, C.H.,

15  referred to as initial C.H., provided the victim's name,

16  address, and specific instructions.

17        There was two things that stood out, one was do not do

18  at the home, the Touche081970 did not want this done at the

19  home and, two, specifically requested that the job get done

20  between July 5th and July 11th, the same dates of travel

21  that we later learned Ms. Stinson was traveling to Hawaii.

22  Q.    Based on your training and experience, why would an

23  individual request a murder for hire to occur while they're

24  not -- if they're on vacation essentially, not at their

25  normal place?

1   A.   For alibi reasons, to put themselves -- create some

2   physical distance between the event or the crime and

3   themselves.

4   Q.   And did those travel dates also match or coincide with

5   the IP address from Hawaii that was found within the

6   Coinbase records?

7   A.   Yes.

8   Q.   All right.  So while all of this is going on, as far as

9   the FBI backtracking or trying to corroborate the

10  information that was provided by the CHS, at some point, did

11  you or someone from your agency make contact with the

12  victim, C.H.?

13  A.   Yes, I did.

14  Q.   Where did you make contact with C.H.?

15  A.   We made contact with the victim, C.H., at the address

16  provided on the order on the website.

17  Q.   Okay.  So victim C.H. did in fact live at the address

18  that was placed on the order for a hitman; is that correct?

19  A.   Correct, the address placed on the order was accurate

20  and we actually made contact with the potential victim

21  there.

22  Q.   When you communicated with that victim, had you already

23  had Ms. Stinson's identity?

24  A.   Yes.

25  Q.   And did you advise the victim -- well, just what did

1  you tell the victim at that point?

2  A.   Well, one, we informed the victim of what was going on

3  with the information we had.  It was very early on in the

4  investigation.  As a matter of fact, it was day one of the

5  investigation.  We informed the victim of what had

6  transpired on the website for safety reasons.  And, number

7  two, you know, we asked the victim -- at this point it was

8  the victim and her significant other, her husband -- you

9  know, if they knew of anyone who would do this -- want to do

10  this to them or to her.  And then we also provided the

11  information we received from the website.  In this case we

12  showed the victim a picture of Ms. Stinson that was provided

13  to us from Coinbase.

14  Q.   Okay.  And upon showing the photograph of Ms. Stinson,

15  did the victim and/or her spouse, S.H., recognize

16  Ms. Stinson?

17  A.   Yes.  They both did, yes.

18  Q.   At some point in this investigation, did the FBI decide

19  to use an undercover agent?

20  A.   Yes.

21  Q.   What was the purpose of using an undercover agent?

22  A.   The purpose of using the undercover agent was to verify

23  or validate the information we had received to date.

24  Although everything was checking out, we wanted to -- you

25  know, to further strength what we believed was going on by

1  the use of an undercover directly contacting Ms. Stinson.

2  Q.   Were you the undercover agent?

3  A.   I was not, no.

4  Q.   Specifically, what did -- what was the plan, what did

5  the UC do?

6  A.   So the undercover, using the phone number that we knew

7  belonged to Ms. Stinson -- we knew this because it was

8  provided on the Coinbase information and it was also the

9  phone number subscribed to Ms. Stinson.  The undercover,

10  using the WhatsApp messaging application, the undercover

11  contacted Ms. Stinson via text.  So the first text -- the

12  first communication was via text.  The undercover sent

13  Ms. Stinson a text message.  In that text message, the

14  undercover provided two photographs.  One photograph was a

15  photograph provided on the order on the website.  So going

16  back to the order, when someone places an order on this

17  website, it's typical for them to provide a picture of the

18  target, right, the person they want killed?  So they

19  provided a picture.  In this case, we had a picture of

20  victim C.H. that was provided on the website.

21       And then the second picture the undercover provided via

22  text to Ms. Stinson was a photograph I took of C.H.  So I

23  went out to C.H.'s residence and with C.H.'s consent and

24  permission, I took a photograph of C.H.  It was much like a

25  surveillance photograph, it was a photograph of C.H. trying

1    to get into a vehicle.  It was taken at a distance, much

2    like a person conducting surveillance or watching a person

3    would take.

4        So the undercover sent those two pictures to

5    Ms. Stinson and asked Ms. Stinson if this was the correct

6    person or if this person was the same person.

7    Q.   So to clarify, that first photo, that was the photo

8    that was -- that the Touche081970 account uploaded to the

9    website when placing the initial order for a hit; is that

10   correct?

11   A.   Correct.

12   Q.   Can you just briefly describe what WhatsApp is?

13   A.   WhatsApp is a messaging service.  You can send text

14   messages, you can make voice calls, and you can make video

15   chats.  It's encrypted, meaning that the messages are

16   transmitted -- it's called point-to-point encryption.  The

17   message is encrypted until it gets to the receiver.  It's an

18   application that can be downloaded on an iPhone or an

19   Android phone.

20   Q.   At the time that the undercover was reaching out to

21   Ms. Stinson using her known phone number on WhatsApp, was he

22   able to see a profile picture associated with that WhatsApp

23   account?

24   A.   Yes.

25   Q.   Have you had an opportunity to view it?

1  A.   Yes.

2  Q.   And what is it a picture of?

3  A.   It's a photograph of Ms. Stinson's face.

4  Q.   Do you know or remember when the undercover made

5  contact with Ms. Stinson initially on WhatsApp?

6  A.   It was towards the end of August of this year.

7  Q.   And I think you mentioned that it was via text message;

8  is that correct?

9  A.   Correct.

10 Q.   Where he or she sent the two photos?

11 A.   Yes.

12 Q.   Okay.  After those two photos were sent -- well, let me

13 back up.

14      Have you had an opportunity to review the text

15 communications between the undercover and Ms. Stinson?

16 A.   Yes.

17 Q.   What is the general nature of those communications?

18 A.   In that first communication, it was solely to provide

19 those two photographs and to get Ms. Stinson to confirm that

20 this was the same person on both photographs.

21 Q.   Did she ever confirm whether or not it was the same

22 individual?

23 A.   She did, she replied that it was the same individual.

24 Q.   Okay.  Specifically, do you remember what she said?

25 A.   Specifically, I don't remember, but something along the

42

```
 1   lines of it is or, yes, it is, or...
 2   Q.   Would your complaint refresh your recollection?
 3   A.   Sure.
 4   Q.   Okay.  I'm showing you paragraph 27 of Document 1,
 5   which has also been premarked as Government Exhibit 1.
 6           THE COURT:  Ms. Thelwell, if you wish to approach
 7   the witness, if you would kindly ask for permission and
 8   then --
 9           MS. THELWELL:  Yes, Your Honor.  May I approach
10   the witness?
11           THE COURT:  You may.
12           MS. THELWELL:  Thank you.
13           THE COURT:  Ms. Thelwell, for the record, have you
14   shown the document, which has been identified for purposes
15   of identification as the complaint to defense counsel?
16           MS. THELWELL:  Yes, Your Honor.
17           THE COURT:  Thank you.
18   BY MS. THELWELL:
19   Q.   The bottom of paragraph 27?
20   A.   Yes.  So her -- Ms. Stinson's response to the
21   undercover when the two photographs were sent, her response
22   was, it looks right.
23   Q.   All right.  Thank you.  Apart from the text
24   communications, did the undercover engage in any further
25   communications with Ms. Stinson?
```

1   A.   Yes.   Shortly after the undercover communicated via

2   text message, the undercover went ahead and placed a voice

3   call, again, via WhatsApp, a voice call much like a

4   telephone call to Ms. Stinson.

5   Q.   And was that call recorded?

6   A.   It was, yes.

7   Q.   Have you had an opportunity to review it?

8   A.   Yes.

9   Q.   Can you tell us the general nature of that

10  conversation?

11  A.   Yes.   So the undercover, you know, made the phone call

12  to Ms. Stinson, Ms. Stinson answered the phone call.   The

13  undercover, again, used the same phone number previously

14  used to send the text messages, so based on my experience, a

15  receiver of this phone call would know it's the same person

16  calling as the previous text messages.   The undercover went

17  ahead and explained why the job hasn't gotten done.   The

18  undercover went into details as far as saying that there was

19  another person in this house, referring to the victim's

20  spouse, saying that, you know, he was -- he was in the

21  house, that's why the job hadn't gotten done.

22       The undercover went on to explain how he was gonna do

23  the job.   In this case, he said he was gonna make this job

24  look like a robbery, that he was gonna rob the victim and

25  then kill her.   He told Ms. Stinson that he was gonna do

44

1  this using a gun.  He specifically said he needed to buy a

2  revolver to do this -- to do this job.  So he then asked

3  Ms. Stinson if she could send him a Western Union wire

4  transfer for him to purchase this revolver.  She declined,

5  she said she did not want to send a Western Union wire

6  transfer because it could be traced.  The undercover then

7  asked if she was willing to send the payment via bitcoin and

8  she agreed.

9      The undercover then ended the conversation by saying

10  something along the lines of, hey, I'll reach out to you

11  when -- for more information on this bitcoin payment, do not

12  reach out to me.  He then told the -- Ms. Stinson that the

13  job should get done soon.

14      He also told Ms. Stinson that he had previous

15  experience doing these kind of jobs and that sometimes

16  people have regrets.  He asked Ms. Stinson if she would have

17  any regrets and if she was sure that she wanted to do this,

18  which she replied, yes.

19  Q.   Yes, meaning she was sure?

20  A.   Yes, correct.

21  Q.   At some point, did the undercover provide the defendant

22  with a specific unique bitcoin address to send payment for

23  the gun?

24  A.   Yes.

25  Q.   And how much was the payment supposed to be?

1   A.   The payment was supposed to be $350.00.

2   Q.   Do you know whether or not the defendant actually

3   provided that money to the undercover?

4   A.   She did.  After the undercover provided the unique

5   address in -- where to send the bitcoin payment, that same

6   day or shortly after that account controlled by the FBI

7   received bitcoin, which at the time was equivalent to

8   $350 -- around $350.00.

9   Q.   All right.  So after that payment, was there any

10  additional communication between the undercover and the

11  defendant?

12  A.   No.

13  Q.   What did you do next in your investigation at this

14  point?

15  A.   After that, at that point, we provided, you know, the

16  evidence we had to the U.S. Attorney's Office in this

17  District to pursue a, you know, arrest.

18  Q.   You have in front of you what's marked as Government

19  Exhibit 1.  Can you just flip to the front, look at the

20  pages, tell me if you recognize that?

21  A.   Yes.

22  Q.   What is Government Exhibit 1?

23  A.   This is the complaint filed.  This is an affidavit

24  provided by myself to your office.

25  Q.   And how do you know that Government Exhibit 1 is the

1    criminal complaint associated with this particular case?

2    A.   It's labeled on the first page.

3    Q.   And so you see the defendant's name and the case number

4    for this case?

5    A.   Correct.

6    Q.   Do you see your signature on the front page and on the

7    affidavit?

8    A.   I do, yes.  Yes.

9    Q.   Does Government Exhibit 1 fairly and accurately depict

10   the complaint -- the criminal complaint that you secured in

11   this case?

12   A.   Yes.

13           MS. THELWELL:  At this time, Your Honor, the

14   United States seeks to admit Government Exhibit 1.

15           THE COURT:  Any objection?

16           MR. HALL:  No objection.

17           THE COURT:  Government's 1 is admitted.

18           (Government Exhibit No. 1 received in evidence.)

19           THE COURT:  Ms. Thelwell, do you have a copy of

20   that document that is gonna serve as the formal exhibit for

21   court purposes?

22           MS. THELWELL:  Yes, Your Honor, the witness has

23   it.

24           THE COURT:  Okay.  Mr. Hall, I assume you have a

25   copy of the complaint identical to the one that has been

1  admitted?

2          MR. HALL:  I have my own copy.

3          THE COURT:  Okay.  Thank you.

4          MS. THELWELL:  I have extra copies in case anybody

5  needs it, Your Honor.

6  BY MS. THELWELL:

7  Q.  All right.  So, Agent Fuentes, the testimony that

8  you've provided today here in court, as well as the

9  information contained in the affidavit, does that cover

10  every single thing that you know about this investigation?

11  A.  No.

12  Q.  Are you statements today and your statements in the

13  affidavit limited to those necessary to establish probable

14  cause?

15  A.  Yes.

16          MS. THELWELL:  Your Honor, at this time I don't

17  have any additional questions for the witness.

18          THE COURT:  Okay.  Thank you.

19          Mr. Hall, any cross-examination?

20          Just for the benefit of counsel, the Court may

21  have to take a recess at 2:30.  It has another matter

22  scheduled.  Then I'll talk to those parties and alert them

23  if we're going to go beyond that time.

24          MS. THELWELL:  Yes, Your Honor.

25          THE COURT:  And with that, Mr. Hall.

CROSS-EXAMINATION

BY MR. HALL:

Q.   Good afternoon.

A.   Good afternoon.

Q.   You've indicated you've been with the FBI since 2008?

A.   Yes, sir.

Q.   And then prior to that you were working in D.C. also with the FBI; is that true?

A.   Yes, sir.

Q.   So a total of how many years?

A.   Fifteen years.

Q.   Now, you indicated to Judge Tuite that this crime that you've investigated came to the FBI's attention because of someone was monitoring the dark net, can I say that?  And they reported information to the FBI about a possible crime or solicitation for murder for hire?

A.   I do not recall the monitoring part, but, yes, somebody provided information from activities happening on the dark web, yes.

Q.   So in other words, someone was on the site, even if not monitoring, they reported some allegation about a murder for hire; would that be fair to say?

A.   I'm not sure they were on or off the site, but, yes, they reported -- they reported information from the site.

Q.   That they saw on the site?

1  A.   I don't believe they saw it on the site, no.

2  Q.   Okay.  In any event, they reported this information to

3  the FBI about a murder for hire?

4  A.   Correct.

5  Q.   And I believe you said something about this source

6  was -- has been used by the FBI before; is that --

7  A.   Yes.

8  Q.   Now, let's talk about this site.  It is a -- it's a

9  site, but within the site, it's the dark net or the Tour; do

10 I have it right?

11 A.   No, that's incorrect.  The site is within the Tour

12 network.  So it's not the site and then within the site

13 there's another section of the site, the site is within the

14 dark net, what's referred to as a dark net.

15 Q.   Okay.  So you go to the dark net -- let me see if I

16 have this right -- and then there's a section where -- that

17 a person can go to the place and order for a murder for

18 hire?

19 A.   You go onto the network, referred to as the dark net or

20 the dark web.  It's a network of websites.  Within that

21 network there is, I don't know, thousands or tens of

22 thousands of websites.

23 Q.   Right.

24 A.   This is one of the websites within this network and

25 this website happens to be one where somebody can go on

1  there and order a hitman.

2  Q.   Okay.  And I believe and Ms. Thelwell was talking

3  about -- referring to this as the site?

4  A.   The website, correct.

5  Q.   Okay.  Where the order can be placed?

6  A.   Correct.

7  Q.   Okay.  And is this a real website or is it a fake

8  website where you can place this order for a hit?  It's

9  fake, right?

10 A.   You need to define fake.  It's a real website, it

11 works --

12 Q.   In the common dictionary language, it's fake, it's not

13 real, no one's gonna carry out a murder, right, when you

14 place that order?

15 A.   My understanding is that the website, not that it's

16 fake, but it's a scam, right?

17 Q.   Okay.  All right.  So a scam.  So when we develop that,

18 scam meaning someone can place an order for a murder, but

19 who they placed that order to, they're not gonna go out and

20 do it?

21 A.   Yes, correct.  That's my understanding, yes.

22 Q.   Okay.  Because if that was the case, that's illegal,

23 right?

24 A.   Correct.

25 Q.   Okay.  Now, this scam site, the site to place this

```
1    order, it does take people's money, it just doesn't perform

2    the service; wouldn't that be fair to say?

3    A.   That's fair, yes.

4    Q.   And what is the -- this site, the site, what is the --

5    is there a physical location, you can Judge Tuite about

6    where it's located?

7    A.   No, I do not know the location where the site is

8    hosted.  I do not know that information, no.

9    Q.   Okay.  Even if you don't know, does your agency know?

10   A.   I don't know.  I don't know the answer --

11   Q.   How can I find them?  I want to talk to them.  How can

12   I find them?

13   A.   The website?

14   Q.   No, no, no, physically who's in charge of this site

15   where the order for hire scam -- murder for hire scam, I

16   want to know where I can go find them and talk to them.

17   Where would I go?

18   A.   Look, I don't know.  That is the purpose of the dark

19   web, it's --

20   Q.   Right.

21   A.   -- pretty anonymous.

22   Q.   Fairyland, it doesn't exist?

23   A.   That's not what I said.  If it does exist --

24   Q.   Excuse me --

25             THE COURT:  Hold on.  For both the witness and
```

1    Mr. Hall, if Mr. Hall is speaking, Agent, you'll to allow

2    him to finish.

3            Mr. Hall, the same would apply.  The agent is in

4    the process of answering, if you'll allow him to finish his

5    answer and then you can go from there.  Why don't we return

6    to the original question.

7    BY MR. HALL:

8    Q.   Where would I go to find the site, the people that hose

9    this site where murder for hires are placed?  Where would I

10   go?

11   A.   I do not know.

12   Q.   Even if you don't know, does the FBI know, who you work

13   for, the agency, can you tell us where would we go to find

14   this -- the site?

15   A.   I do not know if the FBI knows where to go to find this

16   site.

17   Q.   So your employer doesn't even know?

18   A.   I'm not saying they don't know, I'm saying I don't know

19   if they know.

20   Q.   And it would be illegal for this site to carry out

21   murder for hires; wouldn't you agree with that?

22   A.   Correct.  If the site was in the United States, yes, it

23   would violate United States laws.

24   Q.   Come, come, now.  The FBI does extradition, right?

25   A.   Yes.

1    Q.   And taking people that commit crimes in this country,

2    they'll go to another country and get them if there -- if

3    there's an extradition treaty, right?

4    A.   Correct.

5    Q.   You've participated in extraditions, haven't you?

6    A.   Yes.

7    Q.   So it doesn't matter where the person is that wants to

8    carry out a murder for hire, it's against the law and

9    you-all would go get the person, right?

10   A.   The user of the site, yes.

11   Q.   You said something about -- while you were -- I think

12   you said you went to the site?

13   A.   Yes.

14   Q.   And you saw FAQs?

15   A.   Yes.

16   Q.   Frequently asked questions?

17   A.   Correct.

18   Q.   And that was -- when I say the site, this website,

19   again, it's a scam site?

20   A.   Yes.

21   Q.   Steals money from people?

22   A.   That's my understanding, yes.

23   Q.   But does not perform the service?

24   A.   Not that I know of, correct.

25   Q.   And in this case the murder for hire?

```
 1   A.   Correct.

 2   Q.   Now, you told Judge Tuite about a user name, it is 2T

 3   or Touche081970?

 4   A.   Correct, yes.

 5   Q.   Is that right user name you gave Judge Tuite?

 6   A.   Yes.

 7   Q.   And did you research that name, that user name?

 8   A.   On the website?

 9   Q.   Or in your investigation in this case.

10   A.   I did, yes.

11   Q.   Okay.  And when I said investigate that, you pulled I

12   guess the subscriber information; would that be fair to say?

13   A.   I was provided what could be considered subscriber

14   information by the source in Knoxville.

15   Q.   Okay.  Did you extend that investigation and try to

16   learn the identity of who the user name Touche081970

17   actually belonged to?

18   A.   Yes.

19   Q.   Okay.  How did you do that?

20   A.   So we did because the website provided a payment

21   history, that's how we were able to do that.

22   Q.   Right.

23   A.   They provided payment received from this user,

24   Touche081970.

25   Q.   Okay.
```

1  A.   The website provided the payment information.  We were

2  able to -- we, the FBI, was able to track that payment, came

3  from a Coinbase account.

4  Q.   Right.

5  A.   Coinbase was served legal process and provided us the

6  true name of the defendant, De Anna Stinson, associated with

7  that Coinbase account.

8  Q.   The Coinbase account or Touche, or are they one and the

9  same?

10  A.   Touche081970 used a Coinbase account.  That Coinbase

11  account belongs to Ms. Stinson.

12  Q.   Okay.  And so Coinbase, you indicated you served them

13  with process to learn the identity of who that account

14  belonged to?

15  A.   Correct.

16  Q.   And they gave you all the identifiers of that account?

17  A.   Yes, sir.

18  Q.   And that led to Ms. -- the identification of

19  Ms. Stinson?

20  A.   Yes.

21  Q.   Okay.  And what information was provided by Coinbase to

22  identify Ms. Stinson specifically?

23  A.   Her name, her date of birth, her email address, her

24  phone number, her bank account --

25  Q.   Which was what -- what bank.  Chase?

1  A.   So it ended up being Chase.  Coinbase did not provide

2  us the name of the bank, just routing numbers.

3  Q.   Okay.

4  A.   We later learned that, yes, it was a Chase account.

5  Q.   Okay.  And it was two accounts?

6  A.   It was two accounts, yes.  One --

7  Q.   Go ahead.

8  A.   One was a personal account --

9  Q.   Right.

10 A.   -- under the same De Ann Stinson -- De Anna Stinson,

11 and the second was a business account.

12 Q.   Which was?

13 A.   I believe the name was WOE Consulting or something

14 along those lines.

15 Q.   All right.

16 A.   Which was a -- which was a company -- which is a

17 company registered to De Ann Stinson (sic).

18 Q.   Okay.  I may have cut you off when I was asking you

19 about the identifiers of the Coinbase account.  You

20 indicated Coinbase had provided several documents and I

21 don't know if you completed telling me all the documentation

22 they provided identifying Ms. Stinson.

23 A.   I think I touched them all.  So name, date of birth,

24 email address, phone number, bank account numbers, and then

25 they provided IP addresses used to make transactions.

1  Q.   What about an ID, was that -- did I hear you --

2  A.   And a Florida driver's license was provided, yes.

3  Q.   Okay.  And then you're familiar with David?

4  A.   I am, yes.

5  Q.   Okay.  Did you use David at that time to further your

6  investigation in this case?

7  A.   Yes.

8  Q.   At that time you did --

9  A.   Yes.

10  Q.   -- or at some point later?

11  A.   I can't remember exactly when, but, yeah, I did use

12  David, yes, subsequent to that, yes.

13  Q.   Okay.  And you verified in fact the same photograph

14  that was given to you by Coinit?

15  A.   Yes.

16  Q.   Coinbase, I'm sorry.

17  A.   Yes.

18  Q.   Now, I think you told Judge Tuite that the Touche

19  account, if I have it right in my notes, the Touche account

20  was created June of this year of July?

21  A.   According to the information we received from the

22  source -- or FBI Knoxville did, it was June of this year.

23  Q.   And this request on the website was for a hitman with a

24  history of getting the job done; is that right?

25  A.   Yes.

1  Q.   And that was to this same scam site that you've been

2  referring to?

3  A.   Yes.

4  Q.   That does not carry out murder for hire; is that right?

5  A.   It's my understanding that they don't, no.

6  Q.   Now, you told Judge Tuite that there were a total of

7  five transactions committed -- or made by Ms. Stinson, five

8  transactions for this murder for hire, alleged murder for

9  hire, that totaled $12,000; do I have that right?

10 A.   Correct, yes.

11 Q.   What do you have in front of you?

12 A.   It's just the complaint.

13 Q.   Just the indictment?  Okay.

14     That was for -- that represents all the transactions

15 during this particular case?

16 A.   That I'm aware of, yes.

17 Q.   At this point?

18 A.   At this point, yes, that I'm aware -- as far as I know,

19 yes.

20 Q.   And of those five transactions, is it your testimony

21 that each of these transactions is traceable back to

22 Ms. Stinson?

23 A.   I don't think we can say that at the moment.  We know

24 one of the transactions is traced back to the Coinbase

25 account that belongs to Ms. Stinson.

1   Q.   Okay.  All right.  And what about the other four?

2   A.   The other four we suspect are coming back to the same

3   Coinbase account or another virtual currency, another like

4   Coinbase account.

5   Q.   Say the last part again.  The last part.

6   A.   Coinbase is not the only exchange out there, there's

7   more.  But we suspect that the other transactions also come

8   back to a Coinbase account or another exchange belonging to

9   Ms. Stinson.

10  Q.   Okay.  In any event, you seemed hesitant in your

11  answer.  Is that because the investigation is ongoing in

12  this case?

13  A.   Correct, yes.

14  Q.   And then, also, all five of these transactions total

15  somewhere in the neighborhood of $12,000?

16  A.   Yes.

17  Q.   More or less.  Okay.  I didn't follow you on chain

18  analysis.

19  A.   Chain analysis?  Again, it's not something conducted by

20  me.  The FBI has, you know, experts that conduct its chain

21  analysis.  Chain analysis, all it is is tracking, following

22  the money as far as bitcoin is concerned.

23  Q.   Hence the name chain?

24  A.   Yes, correct.

25  Q.   And then when you say blockchain analysis, that's what

1   I had in my notes --

2   A.   Yes, yes, blockchain analysis.

3   Q.   And just so I have it right, because I've had to

4   educate myself on this bitcoin stuff, I think you said

5   Coinbase was served with process and that was investigated

6   and that led back to the account in this being assigned to

7   Ms. Stinson?

8   A.   Correct, yes.

9   Q.   And is it your testimony that the bitcoins flowed from

10  Ms. Stinson's Coinbase account to the website?

11  A.   According to the blockchain analysis, yes.

12  Q.   Okay.  The website being the scam site?

13  A.   Yes, the website, yes.

14  Q.   IP addresses are unique?

15  A.   IP addresses, if it's a -- yes, if it's an external IP

16  address, yes, it's unique.

17  Q.   Like a Social Security number?

18  A.   Correct.

19  Q.   Fingerprints?  Fingerprints?  Like fingerprints,

20  they're unique?

21  A.   Yes, fingerprints are unique, yes.

22  Q.   Now, you indicated that there was an IP address that

23  went to a Charter Communications?

24  A.   Yes.

25  Q.   Here in Tampa?

```
 1   A.    Correct.

 2   Q.    Okay.  And what is Charter Communications?

 3   A.    It's an internet service provider, provides internet,

 4   in this case, to residential neighborhoods or homes.

 5   Q.    Okay.  Is there a mother company, Comcast, Frontier,

 6   anything or --

 7   A.    I couldn't tell you, I don't know.

 8   Q.    All right.  And the IP address, is it your testimony

 9   that the IP address went to Ms. Stinson's residence?

10   A.    According to -- yes, according to their response to a

11   grand jury subpoena, yes.

12   Q.    Okay.  And you also mentioned something about Hawaii

13   Communications?  You mentioned something about Hawaii

14   communications?

15   A.    Yes, one of the IP addresses resolved, meaning it was

16   owned by Hawaii Telecom.

17   Q.    And what's the significance of that in this case?

18   A.    It's significant because we learned from travel records

19   that Ms. Stinson was in Hawaii.

20   Q.    Are you -- is it your testimony that while she was in

21   Hawaii there was some type of communications or

22   transmissions of some sort related to this case and the

23   alleged crime?

24   A.    Yes.  Yes, from Hawaii there was access -- or

25   transactions made on De Anna Stinson's Coinbase account.
```

1          MR. HALL:  Judge, you want to take a break or are

2    you -- you want me to keep going?

3          THE COURT:  Is this a good place for you to stop?

4          MR. HALL:  I can, Judge.

5          THE COURT:  Okay.  Again, for the parties, the

6    Court had scheduled another hearing at 2:30 believing that

7    an hour and a half would be ample time.

8          MR. HALL:  I'm sorry.

9          THE COURT:  That's okay.  And originally we had

10   another hearing scheduled at 2:00, so I understand that

11   there's more to be done here.

12         So, Mr. Hall, I'm not cutting you short at all,

13   we'll just take a short recess, I'll discuss the matter of

14   this ongoing hearing with the parties that are waiting at

15   2:30 and I'll return to the bench in ten minutes or so.

16         MR. HALL:  I think 15 minutes will do it for me,

17   Judge.

18         THE COURT:  Pardon?

19         MR. HALL:  I just wanted to give you that.  I

20   think 15 minutes, I'll be done.  I just wanted to let you

21   know that.

22         THE COURT:  Okay.  I'll talk to the other parties

23   about the other hearing and --

24         MR. HALL:  Okay.

25         THE COURT:  -- give them that rough estimate.

1          MR. HALL:  Okay.

2          THE COURT:  Ms. Thelwell, obviously Mr. Hall has

3   not completed his cross-examination.  Do you anticipate any

4   redirect?

5          MS. THELWELL:  It'll be very brief, Your Honor.

6          THE COURT:  Why don't we take a -- we'll do a

7   short recess and we'll return to the bench once I've

8   discussed the matter with the other parties.  We'll be in

9   recess.

10         (A brief recess was taken, after which the

11   following proceedings continued in open court.)

12         THE COURT:  The record should reflect that the

13   Court took roughly a 15-minute recess.

14         And, Mr. Hall, your representation about 15

15   minutes has not only been represented in this case, but it's

16   been represented in the other case, which is a civil matter.

17         MR. HALL:  Oh, it is.  Thank you.

18         THE COURT:  You sound so dismissive about civil

19   matters, Mr. Hall.

20         MR. HALL:  I know that Your Honor loves the

21   criminal attorneys better than the civil attorneys.  I

22   better look around, make sure they didn't hear me.  Thank

23   you, sir.

24         THE COURT:  No comment there, Mr. Hall, but I'll

25   let you proceed.

1          MR. HALL:  All right.  Thank you very much.

2     BY MR. HALL:

3     Q.   Before the break, Agent Fuentes, you were saying to

4     Judge Tuite about a -- Ms. Stinson had some communications

5     while -- Hawaii communications while she was in Hawaii or

6     transactions, communications?

7     A.   According to the information from Coinbase, there was

8     transactions, they were done from an IP address in Hawaii.

9     Q.   Okay.  And related to that you had said on direct

10    examination that Ms. Stinson had in fact traveled to Hawaii?

11    A.   Correct, yes.

12    Q.   And that was during the month of July?

13    A.   Yes.

14    Q.   I want to say July 5th is when she departed?

15    A.   Correct.

16    Q.   Okay.  And at this time she was in fact being

17    investigated by the FBI; would that be fair to say?

18    A.   On July 5th?

19    Q.   Or prior to.

20    A.   No, she was not.  Our investigation initiated at the

21    end of July.

22    Q.   At the end of July?  Okay.  In any event, Ms. Stinson

23    did in fact go to Hawaii as verified by you?

24    A.   Correct.

25    Q.   Is that right?

1   A.    According Delta Airline records, Ms. Stinson took a

2   flight from Tampa to Hawaii.

3   Q.    Okay.  And she in fact returned to the United States?

4   A.    Yes.  Well, she -- to the mainland, yes.

5   Q.    I'm sorry?

6   A.    She returned to Florida.

7   Q.    You told Judge Tuite that you spoke with the alleged

8   victim in this case, C.H.?

9   A.    Yes.

10   Q.    You personally did?

11   A.    Yes.

12   Q.    And that's down in your Division, the Southern District

13   of Florida?

14   A.    Correct.

15   Q.    I believe you indicated that you went to the

16   victim's -- the alleged victim's residence; is that right?

17   A.    Correct, yes.

18   Q.    And at some point you showed her -- told her what was

19   going on, what -- the nature of your investigation?

20   A.    Yes.

21   Q.    She was shocked?

22   A.    She was.

23   Q.    Okay.  All right.  And she, being C.H., knows

24   Ms. Stinson; is that right?

25   A.    Yes.

1   Q.   Can you tell Judge Tuite, how long has C.H. known

2   Ms. Stinson?

3   A.   My impression was years, but I couldn't tell you.

4   Q.   I didn't hear -- years?

5   A.   That was my impression, yes.  I don't have an exact

6   answer for you, but my impression is she knew of Ms. Stinson

7   for years.

8   Q.   In fact, added to that is that she had been in the

9   company, that is C.H., had been in the company of

10  Ms. Stinson before?

11  A.   My understanding she had been, but it was rare, it

12  wasn't often.  She has been in her presence a handful of

13  times maybe.

14  Q.   And each of those handful of times they were cordial

15  interactions; isn't that true?

16  A.   According to her, yes.

17  Q.   And then C.H., she has a husband, S.H.; is that right?

18  A.   Yes.

19  Q.   S.H. knows Ms. Stinson very well; isn't that right?

20  A.   My understanding, yes.

21  Q.   And I would underline very well; isn't that right?

22  A.   (No audible response).

23  Q.   Can you explain to Judge Tuite why does S.H. know

24  Mrs. Stinson that well?

25  A.   S.H. was in a romantic relationship with Ms. Stinson on

1    and off for a significant amount of time.

2    Q.   Now, and here you don't say several years, you say

3    significant, was your choice of words.  How long would

4    you -- can you put some years on that significant amount of

5    time?

6    A.   I cannot.  I cannot.  I know it was more than a year,

7    but I don't know the exact time.

8    Q.   In any event, it was a significant amount of time?

9    A.   I would say yes.

10   Q.   Okay.  And isn't it also true that that relationship

11   ended September of 2019?  Are you aware of that?

12   A.   I am not, no.

13   Q.   Did you ask Mr. -- I'm sorry, S.H. about the nature of

14   his relationship with Ms. Stinson?

15   A.   Current relationship at the time I spoke to him?

16   Q.   The relationship he had had, the dating relationship

17   they had for a substantial period of time?

18   A.   Yes.

19   Q.   Okay.  And did he tell you when that relationship

20   ended?

21   A.   He did not.  I don't recall him saying when it ended.

22   I do recall him saying the last time he spoke with her.

23   Q.   Okay.  When was that?

24   A.   I believe that was in December of 2019.

25   Q.   He got --

```
 1   A.   According to him.

 2   Q.   Okay.  That's what told you?

 3   A.   Yes.

 4   Q.   And he got married when?

 5   A.   I believe December of 2019.

 6   Q.   Do you know -- did he tell you whether or not he was

 7   still seeing -- I'm sorry.

 8        Let me do this:  You told Judge Tuite that you spoke

 9   with the alleged victim, C.H., who is the wife of S.H.  Did

10   C.H. ever tell you how long she and S.H. had dated or were

11   engaged?

12   A.   I do not recall.  I don't know.

13   Q.   Did you ask the question?

14   A.   I might have.  I don't remember the specifics to that.

15   Q.   Would it be fair to say that while they got -- they

16   being C.H. and S.H. got married in December of 2019?

17   A.   That's my understanding, yes.

18   Q.   And the last time that S.H. says he spoke to

19   Ms. Stinson was also in December of '19?

20   A.   Correct.

21   Q.   Be fair to say that while -- well, did C.H. say that --

22   did C.H. at least tell you that she had been engaged to S.H.

23   for a few months, years, anything of that nature?

24   A.   I don't recall how long, but she did say that she had

25   been engaged to S.H.
```

1    Q.   And that engagement would have lasted I'm sure longer

2    than two or three days or a few weeks in December of 2019?

3              MS. THELWELL:  Your Honor, objection, called for

4    speculation.  The witness has already testified that he does

5    not --

6              MR. HALL:  Objection to the speaking objection.

7              MS. THELWELL:  Calls for speculation, Your Honor.

8              MR. HALL:  The Rules of Evidence do not apply

9    by --

10             THE COURT:  Okay.  As far as the objection itself,

11   Mr. Hall, I'll have you ask the question again.

12             MR. HALL:  Okay.

13             THE COURT:  As far as it being a speaking

14   objection, it's not a speaking objection of the type that

15   I'm sure you've seen --

16             MR. HALL:  All right.

17             THE COURT:  -- abused in court at any time.

18             MR. HALL:  All right.

19             THE COURT:  So --

20             MR. HALL:  Thank you.  I'll move on, Judge.

21             THE COURT:  Why don't you ask the question again

22   and if the agent has already answered the question and

23   there's been a line of inquiry that you've probed

24   robustly --

25             MR. HALL:  Okay.

1          THE COURT:  -- and you feel like you can move on,

2     then do so.  But you can ask the question again.

3          MR. HALL:  Okay.

4     BY MR. HALL:

5     Q.   So you've indicated that C.H. and S.H. were engaged for

6     I'm gonna say a period of time; fair to say?

7     A.   Fair.

8     Q.   During that same time, C.H. -- I'm sorry, S.H. was also

9     seeing Ms. Stinson; fair to say?

10    A.   I do not know that, no.  Not to my recollection -- I

11    have no information on that.

12    Q.   All right.  Then you told Judge Tuite that an

13    undercover at some point, undercover agent, with the FBI got

14    involved in this case to further the investigation?

15    A.   Yes.

16    Q.   An undercover officer made -- agent made contact with

17    Ms. Stinson?

18    A.   Correct.

19    Q.   And seeing whether or not she wanted to carry out this

20    alleged murder for hire?

21    A.   Yes.

22    Q.   Okay.  An undercover agent was assuming the identity of

23    I guess the hitman?

24    A.   Correct.

25    Q.   Okay.  Now, this undercover agent is in fact an FBI

```
1   agent?

2   A.   Yes.

3   Q.   With arrest authority?

4   A.   Yes.

5   Q.   Okay.  And was he -- was he gonna murder anyone when he

6   was asking questions of Ms. Stinson?

7   A.   The actual agent?  No.

8   Q.   Right.  He doesn't go around and kill people, right?

9   A.   The actual agent?  No.

10  Q.   Okay.

11  A.   Not that I know of.

12  Q.   And the WhatsApp has a profile of Ms. Stinson?  I

13  believe you said that.

14  A.   A profile picture of Ms. Stinson, yes.

15  Q.   And when the undercover said -- I'm sorry.  Do you know

16  the undercover agent or you just know of him, but you don't

17  personally know him?

18  A.   I know of him, we're colleagues, we work together.  So

19  I know of him, yes.

20  Q.   Have you ever met him?

21  A.   Yes.

22  Q.   Okay.  All right.  So when the undercover said -- the

23  undercover of the FBI said he was going to do the job, the

24  murder for hire, and make it look like a robbery murder?

25  A.   Correct.
```

1    Q.   That's what you told Judge Tuite?

2    A.   Yes.

3    Q.   Okay.  That wasn't true, that was a lie, right?

4    A.   The undercover was -- he was role playing, right, he

5    was in pursuit of -- the undercover was not gonna -- the

6    undercover FBI agent was not going to rob and kill

7    Ms. Stinson.

8    Q.   Kill Ms. Stinson?

9    A.   I'm sorry, kill C.H.

10   Q.   Okay.  And so that statement by the undercover agent,

11   would it be true or false?

12   A.   It would be false, a false statement.  He was not gonna

13   kill C.H.

14   Q.   And there was a -- the undercover at some point -- you

15   told Judge Tuite that the undercover had mentioned to

16   Ms. Stinson that he needed a gun in order to commit the

17   murder?

18   A.   Correct.

19   Q.   And that was the first time a gun had been used in this

20   case; be fair to say?

21   A.   Fair, yes.

22   Q.   And that statement of using a gun came not from

23   Ms. Stinson, it came from the agent?

24   A.   Correct.

25   Q.   And that was supposed to cost $350.00; is that right?

```
 1    A.    Correct.

 2              MR. HALL:  May I have a minute?

 3              THE COURT:  Certainly.

 4              MR. HALL:  Judge, I'm almost there.  I'm just

 5    checking my notes to make sure I didn't miss anything here.

 6              Oh, I'm sorry.

 7    BY MR. HALL:

 8    Q.    Did -- you indicated you interviewed C.H. and S.H.  Do

 9    you have any evidence that Ms. Stinson has, prior to her

10    arrest in this case, had contacted C.H. by phone?

11    A.    I do not have any evidence of that, no.

12    Q.    Text message?

13    A.    Not that I'm aware of.

14    Q.    Facebook communication?

15    A.    Not that I'm aware of.

16    Q.    Instagram?

17    A.    No.

18    Q.    Any evidence that Ms. Stinson has stalked the residence

19    of C.H. and S.H.?

20    A.    I have no evidence of that.

21    Q.    And the same set of questions with respect to S.H.

22    A.    Same answer.

23    Q.    No contact as far as you know, stalking the house or

24    anything --

25    A.    Not that I know of.
```

1  Q.   S.H. has known Ms. Stinson for a long time, true?

2  A.   I would say so, yes.

3  Q.   I think they grew up together.  If you know.

4  A.   I don't know that, but it seemed from my conversation

5  with him that, yes, they had a relationship that goes back

6  years.

7  Q.   And he was surprised when you mentioned the nature of

8  your investigation --

9  A.   He was.

10  Q.   -- regarding Ms. Stinson being behind this?

11  A.   He was.

12  Q.   All of the accounts that you've testified to today,

13  whether it's bitcoin, Coinbase, IP addresses, bank accounts,

14  all of those accounts go only to and are related to

15  Ms. Stinson in this case; would that be fair to say?

16  A.   The bitcoin part, that's not an account, but the other

17  accounts, that would be fair to say, yes.  Those accounts

18  were subscribed to by Ms. Stinson and only Ms. Stinson.

19  Q.   Okay.  What's the difference between bitcoin and

20  coinage, the same thing or --

21  A.   Coinbase.  No, Coinbase is an exchange.  Basically it

22  turns U.S. currency into bitcoin.  Bitcoin is the currency.

23  Q.   Okay.  Now, in these documents that I have from

24  Ms. Thelwell, there was something about a virtual coin --

25  A.   That's Coinbase.  Virtual currency exchange.

```
1    Q.   Yes.

2    A.   That's what Coinbase is.

3    Q.   Okay.  Is that an account also or is that separate

4    or --

5    A.   Virtual currency?

6    Q.   Yes, sir.

7    A.   That's just -- that's just explaining what Coinbase is.

8    So when that's referenced in the complaint, we're talking

9    about Coinbase.

10   Q.   It's not a separate account that?

11   A.   It is not, no.

12   Q.   Okay.

13            MR. HALL:  Almost, Judge.  Almost.

14   BY MR. HALL:

15   Q.   How long had Ms. Stinson been surveilled by the FBI in

16   this case?

17   A.   I would say shortly after the initiation of the case,

18   so July 30th --

19   Q.   Up until her arrest probably?

20   A.   Until her arrest.  I mean, it wasn't consistent

21   surveillance, but --

22   Q.   Regular?

23   A.   I would say regular what we call spot checks, just to

24   make sure that we still have somewhat of a location for her.

25   Q.   Did you ever see her moving drugs?  Did you ever see
```

76

1    her moving drugs?

2    A.   I have not.  I conducted no surveillance of her, but I

3    have not seen her moving drugs, no.

4    Q.   Any --

5              THE COURT:  Ms. Thelwell, if you simply stand,

6    then I don't know for sure if you're going to object.

7              MS. THELWELL:  Object, Your Honor, relevance.

8              THE COURT:  Mr. Hall?

9              MR. HALL:  First, the Rules of Evidence do not

10   apply under 3.142 and under the evidence code.  Secondly, I

11   would like to renew a motion to the Court if you'll just let

12   me -- allow me to ask a couple of questions regarding this.

13             THE COURT:  Well, the Rules of Evidence or the

14   rule governing relevance always applies.  Hearsay and such

15   limitations on admissibility --

16             MR. HALL:  Okay.

17             THE COURT:  -- do not apply.  But what's the

18   relevance of questions about drug --

19             MR. HALL:  Judge --

20             THE COURT:  -- drugs and your client?

21             MR. HALL:  I'm sorry.  Judge, under 3.142 I

22   believe new information has come out in this hearing.  I

23   would like to renew a bond motion under the rule that allows

24   you to --

25             THE COURT:  There's going to be -- let me just

1    have you pause.

2           MR. HALL:  Okay.

3           THE COURT:  That's not aimed at the complaint.

4    This is a preliminary hearing aimed at the complaint.

5           MR. HALL:  Okay.

6           THE COURT:  If there's a motion or a desire for

7    the Court to reconsider its bond motion, that will have to

8    be done by way of a formal motion.  The Court will not take

9    such a significant matter about which it has spent a great

10   deal of time --

11          MR. HALL:  Okay.

12          THE COURT:  -- by way of an oral motion.  And

13   then, even if such a motion were to be had --

14          MR. HALL:  Yes, sir.

15          THE COURT:  -- it would have to addressed in the

16   motion what the grounds were for reopening --

17          MR. HALL:  Okay.

18          THE COURT:  And that in and of itself is an

19   independent inquiry that --

20          MR. HALL:  You're right.

21          THE COURT:  -- the Court would have to conduct.

22          MR. HALL:  Okay.

23          THE COURT:  The Court might take a separate

24   hearing on such a matter, but I think for purposes of this

25   hearing, if we could confine ourselves to the probable

1   cause.

2          MR. HALL:  All right.  That's it, Judge Tuite.

3   Thank you so much for your time.  Thank you so much.

4          THE COURT:  Thank you, Mr. Hall.

5          Any redirect, Ms. Thelwell?

6          MS. THELWELL:  Yes, Your Honor.

7                **REDIRECT EXAMINATION**

8   BY MS. THELWELL:

9   Q.   Agent Fuentes, earlier when you were testifying about

10   the contents of the Coinbase records, do you recall what

11   format those records were provided to you in?

12   A.   A spreadsheet.

13   Q.   And Excel spreadsheet?

14   A.   Excel spreadsheet, yes.

15   Q.   And would you say that the Excel spreadsheet had

16   multiple rows and columns?

17   A.   Yes.

18   Q.   In this spreadsheet, did it also contain the banking

19   information?

20   A.   Yes.

21   Q.   I think earlier you testified that you believed the

22   Coinbase records contained account numbers for those -- for

23   the banking information?

24   A.   Yes.

25   Q.   Did it also provide the actual bank name?

```
1    A.    I do not recall the actual bank name.

2    Q.    Okay.  So you'd have to review the records themselves

3    in order to refresh your recollection; is that correct?

4    A.    Yes.

5    Q.    As it relates to the travel, you indicated that

6    Ms. Stinson, the defendant, flew from Tampa International

7    Airport to Hawaii; is that correct?

8    A.    Correct.  I'm not sure the flight was direct, but final

9    destination was Hawaii, yes.

10   Q.    Throughout the alleged criminal activity in this

11   investigation, was Ms. Stinson, the defendant, residing

12   within the Middle District of Florida?

13   A.    Yes.

14   Q.    As it relates to the website, you've called it a scam,

15   right?

16   A.    Correct.

17   Q.    When you personally viewed the website on your

18   undercover computer, did it appear to be a scam to you?

19   A.    No.

20   Q.    Why not?

21   A.    The website had like a --

22             MR. HALL:  May I be heard?

23             THE COURT:  Briefly.

24             MR. HALL:  (Inaudible).

25             THE COURT:  Overruled.  And for the record, there
```

1  was robust cross-examination as to the scam nature of the

2  website, so I think it's fair inquiry briefly on redirect to

3  ask the question that has been asked.

4  BY MS. THELWELL:

5  Q.   You can answer the question.  So did the website appear

6  to be a scam to you?

7  A.   No, it did not.  It was actually quite the opposite.

8  The website had several -- several ways that it validated

9  itself, one being the FAQs, frequently asked questions, and

10 again, they put things on there to make it sound very legit,

11 that this was a website that was not operated by the cops,

12 that actually worked.  I believe the forum section has what

13 I would refer to as testimonial, people on there saying that

14 it had worked and the service was good.  So there was --

15 there was nowhere on this website that said it was a scam or

16 had people saying don't waste your money on this.  I didn't

17 see any of that.

18 Q.   And did you take screen shots of different portions of

19 the website at the time that you observed it?

20 A.   Yes.

21 Q.   And would that -- at what point in your investigation

22 would that have been?

23 A.   It was already on.  Already on.  When I got onto the

24 website, I took screen shots of portions of the website.

25 Q.   Okay.  And based on your knowledge of the

1    investigation, at this time, when was the last time that the

2    Touche081970 account was seen on that website?

3    A.   According to the website itself, that user name, last

4    time I checked had not been on the website since August 10th

5    of this year.

6    Q.   Okay.  And that --

7              MS. THELWELL:  No further questions, Your Honor.

8    Thank you.

9              THE COURT:  Okay.  Thank you.

10             Anything by way of recross, Mr. Hall?

11             MR. HALL:  No (inaudible).

12             THE COURT:  Thank you.

13             I have a question or two, Agent.  Ms. Thelwell had

14   indicated that the CHS, confidential human source, has been

15   provided a number of admonitions or admonishments and was

16   subject to protocols.  Those terms, as I recall, were not

17   identified.  To what protocols and admonishments were you

18   referring as it relates to the confidential human source?

19             THE WITNESS:  All confidential human sources, upon

20   establishing the relationship with the FBI and what we call

21   opening of the CHS, they are to be admonished.  There's

22   specific rules that are read to them.  I wasn't present for

23   this specific CHS, but those rules are, you know, somewhat

24   universal to all CHSs.  They state things as they cannot

25   lie, they have to be truthful in your information, they

1    cannot represent themselves as an agent of the government,

2    they cannot enter contracts on behalf of the government.

3    There's, you know, a number of rules that are read to the

4    CHSs.

5              THE COURT:  Okay.  Any additional questions in

6    light of the Court's question?

7              Mr. Hall?

8              MR. HALL:  No.  Thank you.

9              THE COURT:  Thank you.

10             Ms. Thelwell?

11             MS. THELWELL:  No, Your Honor.  Thank you.

12             THE COURT:  I take it, just to be clear, Mr. Hall,

13   you wish to be heard on the issue of probable cause?

14             MR. HALL:  (Inaudible).

15             THE COURT:  You're waiving probable cause?

16             MR. HALL:  Yes, Judge.

17             THE COURT:  You agree that probable cause has been

18   shown?

19             MR. HALL:  Yes, sir.  (Inaudible).

20             THE COURT:  So with that, Ms. Thelwell, I hear the

21   defense through Mr. Hall to concede the issue of probable

22   cause.  That would appear to end the inquiry.  Anything

23   further from the government?

24             MS. THELWELL:  No, Your Honor.  Thank you.

25             THE COURT:  Thank you.

1          Mr. Hall, anything further from the defense?

2          MR. HALL:  No.  Thank you.

3          THE COURT:  Thank you.

4          Hearing nothing further from either said, we'll be

5    in recess.

6                    (Proceedings concluded.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1   UNITED STATES DISTRICT COURT )
                                 )
2   MIDDLE DISTRICT OF FLORIDA   )

3                   REPORTER TRANSCRIPT CERTIFICATE

4
         I, Howard W. Jones, Official Court Reporter for the
5   United States District Court, Middle District of Florida,
    certify, pursuant to Section 753, Title 28, United States
6   Code, that the foregoing is a true and correct transcription
    of the stenographic notes taken by the undersigned in the
7   above-entitled matter (Pages 1 through 83 inclusive) and
    that the transcript page format is in conformance with the
8   regulations of the Judicial Conference of the United States
    of America.

9

10                              /s     Howard W. Jones
                                _____
11                              Howard W. Jones, RDR, RMR, FCRR
                                Official Court Reporter
12                              United States District Court
                                Middle District of Florida
13                              Tampa Division
                                Date:  4-7-2022
14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION